Jack FOSTER v. JEFFERSON COUNTY QUORUM COURT

94-776                                901 S.W.2d 809

Supreme Court of Arkansas
Opinion delivered June 19, 1995
[Supplemental Opinion on Granting of Rehearing
July 17, 1995.*]
[Motion Requesting Disqualification denied September 25, 1995.†]

---

*Glaze, J., and Special Justice Paula Jamell Storeygard concur. Dudley, Newbern, and Corbin, JJ., dissent. Roaf, J., not participating.

†Roaf, J., not participating.

*Bowden Law Firm*, by: *David O. Bowden*, for appellant.

*Bart Mullis*, for appellee.

*Friday, Eldredge & Clark*, for Arkansas Association of Counties, Amicus Curiae.

ROBERT H. DUDLEY, Justice. The Jefferson County Quorum Court adopted an ordinance providing for the levy and collection of a one percent sales tax to be used for all purposes. The levy and collection, however, were conditioned upon approval of a majority of the electors voting in the November 1993 election. The voters approved the tax. On December 28, 1993, appellant filed this declaratory judgment suit asking the circuit court to rule that the tax constituted an illegal exaction because: (1) the one percent tax violated article 16, section 9, of the Constitution of Arkansas; (2) the ordinance calling the election was introduced improperly; (3) the ordinance levying the tax did not include a provision for a rebate as required by statute; and (4) the Jefferson County Quorum Court failed to follow the requirements of Ark. Code Ann. § 14-14-905(b) (1987). The Jefferson County Quorum Court answered and moved for summary judgment. Appellant filed a cross-motion for summary judgment. The circuit court granted Jefferson County's motion for summary judgment. We reverse and remand.

I

Article 16, section 9, of the Constitution of Arkansas, in the material part, provides: *"No county shall levy a tax to exceed onehalf of one percent for all purposes." Id.* (emphasis added).

■■ The meaning of the provision is clear and certain.

One-half of one percent for all purposes is the limit. When the meaning of a constitutional provision is certain, courts will apply that meaning. *See Rockefeller* v. *Hogue,* 244 Ark. 1029, 429 S.W.2d 85 (1968). Jefferson County, in its answer, admitted that the tax was for all purposes. The certain meaning of article 16, section 9, is that a one percent sales tax for all purposes is unconstitutional.

■ Jefferson County asks us to construe the provision to allow the tax to remain in effect. We decline. Neither rules of construction nor rules of interpretation may be used to defeat the clear and certain meaning of a constitutional provision. Similarly, courts will not resort to extrinsic facts to alter the plain meaning of the language used. *Bishop* v. *Linkway Stores, Inc.,* 280 Ark. 106, 655 S.W.2d 426 (1983); *see also Kervin* v. *Hillman,* 226 Ark. 708, 292 S.W.2d 559 (1956); *Ellison* v. *Oliver,* 147 Ark. 252, 227 S.W.2d 586 (1921).

The amicus curiae brief filed by the Association of Arkansas Counties states that a fiscal emergency will result in many of the counties if we hold this tax to be an illegal exaction. We fully appreciate the argument, but it is not persuasive. The issue is one not of expediency, but one of constitutional law. *See Gipson* v. *Maner,* 225 Ark. 976, 287 S.W.2d 467 (1956).

II

■ Circuit court has subject-matter jurisdiction of illegal exaction suits. *Jones* v. *Clark,* 278 Ark. 119, 644 S.W.2d 257 (1983). Chancery court also has subject-matter jurisdiction of illegal exaction suits. *Nelson* v. *Berry Petroleum Co.,* 242 Ark. 273, 413 S.W.2d 46 (1967). We have held that subject-matter jurisdiction is concurrent; therefore, the issue is one of propriety, not one of subject-matter jurisdiction, and unless the propriety of filing an illegal exaction suit is raised by the parties, we will not consider it. *Beshear* v. *Ripling,* 292 Ark. 79, 728 S.W.2d 170 (1987). The issue of propriety was not raised by the parties; thus, we do not consider it.

■ The reason we have often held that circuit court has subjectmatter jurisdiction of an illegal exaction suit is that Article 7, section 11, provides: "The circuit court shall have jurisdiction in all civil and criminal cases the exclusive jurisdiction

of which may not be vested in some other court provided for by this Constitution." The section means that unless a cause of action is confided by the constitution exclusively to another court, it belongs exclusively, or concurrently, in the circuit court. *State v. Devers*, 34 Ark. 188 (1879). We have said that it means "[a]ll unassigned jurisdiction under the Constitution is vested in the circuit court. . . ." *Patterson* v. *Adcock*, 157 Ark. 186, 248 S.W. 904 (1923). In discussing unassigned jurisdiction of the circuit court in illegal exaction cases, we have written:

> After hearing the matter, the chancellor expressed grave concern about the jurisdiction of the chancery court to act in the matter, as well he might. In view of the disposition we make of the case, however, we need not concern ourselves too much with the serious doubt about the jurisdiction of the chancery court over this action, which basically would appear to fall within the jurisdiction of the circuit court under Art. 7, Sec. 14.

*Mackey* v. *McDonald*, 255 Ark. 978, 504 S.W.2d 726, 730 (1974).

Article 16, section 13, the illegal exaction section, does not specify the court in which the taxpayer's cause of action may be asserted. Thus, subject-matter jurisdiction is unassigned; accordingly, we have held that "an [illegal exaction] action in the circuit court for declaratory judgement is well chosen." *Jones* v. *Clark*, 278 Ark. 119, 644 S.W.2d 257 (1983).

In addition, the public policy expressed by the General Assembly contemplates concurrent jurisdiction. Section 26-35-902 of the Arkansas Code Annotated provides in pertinent part:

> *It is the public policy of this State that circuit and chancery courts* may, in meritorious litigation brought under the Arkansas Constitution, Article 16, § 13, in which the court orders any county, city, or town to refund or return to taxpayers moneys illegally exacted by the county, city, or town, apportion a reasonable part of the recovery of the class members to attorneys of record and order the return or refund of the balance to the members of the class represented.

Ark. Code Ann. § 26-35-902(a) (Supp. 1993) (emphasis added); *see also Harrison* v. *Norton*, 104 Ark. 16, 148 S.W. 497 (1912).

■ Circuit court may have exclusive subject-matter jurisdiction of two kinds of illegal exaction, but that is an issue we need not decide. We only note the issue. In *Jackson* v. *Munson*, 288 Ark. 57, 701 S.W.2d 378 (1986), we said:

> While it is true we have been liberal in permitting illegal exaction suits, *see e.g., Nelson* v. *Berry*, 242 Ark. 273, 413 S.W.2d 46 (1967), we have held that an illegal exaction complaint was not proper where exclusive jurisdiction of the underlying matter was conferred on the circuit rather than the chancery court. *Curry* v. *Dawson*, 238 Ark. 310, 379 S.W.2d 287 (1967).

*Id.* at 58, 701 S.W.2d at 379.

In this case the taxpayer asked the circuit court to go behind the election and issue a declaratory judgment that the election was unconstitutional and void. The underlying matter may be the validity of the election adopting the tax, and although this is not an election contest case, the subject-matter jurisdiction of the underlying matter, the election, is exclusively in circuit court. *Parsons* v. *Mason*, 223 Ark. 281, 265 S.W.2d 526 (1954). However, because this suit was filed in circuit court, there is no need for us to decide if subject-matter jurisdiction was exclusively in circuit court. In addition, a party might be entitled to demand a jury trial in some illegal exaction suits.

■ The dissent to this part of the majority opinion would hold that "the circuit court was wholly lacking in jurisdiction" to decide this case; yet, it cites no case holding that circuit court is without subject-matter jurisdiction of illegal exaction suits. Instead, it states that subject-matter jurisdiction of this case is exclusively in county court because of Article 7, section 28. The opinion overlooks the often discussed distinction between a suit to prevent an illegal exaction on the ground that the tax itself is illegal or unauthorized and a suit to prevent the collection of a tax that is lawful and authorized but is being collected in some erroneous manner. A suit to prevent the collection of an illegal or unauthorized tax is an illegal exaction suit, and subject-matter jurisdiction is concurrently in circuit and chancery court. A suit to prevent the collection of a lawful or authorized county tax that is erroneously assessed or erroneously collected is the kind of suit that belongs exclusively in county court. *Pledger* v. *Featherlight Precast Corp.*,

308 Ark. 124, 823 S.W.2d 852 (1992); *McIntosh* v. *Southwestern Truck Sales*, 304 Ark. 224, 800 S.W.2d 431 (1990).

The case primarily relied on by the dissenting opinion clearly recognizes this distinction. That case, *Scott County* v. *Frost,* 305 Ark. 358, 807 S.W.2d 469 (1991), involved the county property tax. It was not questioned that the county property tax was a valid and lawful tax. Rather, the taxpayer questioned the amount of his lawful property tax because only 40 percent to 45 percent of the property in the county had been reassessed. In holding that county court had exclusive subject-matter jurisdiction of the case because there was no contention that the tax itself was illegal or unauthorized, we wrote: "Mr. Frost is not contending that his assessment is 'illegal or unauthorized' but that there is a procedural flaw. We discussed the distinction in the *McIntosh* case. *See also Burgess* v. *Four States Mem. Hosp.,* 250 Ark. 485, 465 S.W.2d 693 (1971)." *Id.* at 359, 807 S.W.2d at 470.

## III.

██ Article 16, section 13, of the Constitution of Arkansas confers upon any citizen the right to institute a suit to protect against an illegal exaction. The original complaint was for a judgment declaring that the election was "null and void" and that the tax constitutes an illegal exaction. The circuit court erred in failing to declare that the tax constitutes an illegal exaction. We reverse and remand for proceedings consistent with this opinion.

HOLT, C.J., and GLAZE and BROWN, JJ., dissent to part I of this opinion.

CORBIN, J., and Special Justice PAULA JAMELL STOREYGARD dissent to part II of this opinion.

ROAF, J., not participating.

ROBERT L. BROWN, Justice, dissenting. I would affirm the trial court.

The Arkansas Constitution provides this limitation on county taxes:

> No county shall levy a tax to exceed one-half of one percent for all purposes, but may levy an additional one-half of one percent to pay indebtedness existing

at the time of the ratification of this Constitution.

Ark. Const. art 16, § 9. The Arkansas Constitution was ratified in 1874 by vote of the people. At the time of ratification, the only tax contemplated by the Constitution and in effect was the ad valorem property tax. More than sixty years later the Arkansas General Assembly passed a gross receipts tax. *See* Act 386 of 1941, now codified at Ark. Code Ann. § 26-52-101 *et seq.* (Repl. 1992 & Supp. 1993). It is a gross receipts tax — not an ad valorem tax — that is at issue in this appeal.

One rule of constitutional construction which we have followed in the past looks to the history of the constitutional provision and the mischief to be corrected:

> In interpreting constitutional amendments, we have said that a court, in order to determine the meaning and the extent of coverage of a constitutional amendment, may look to the history of the times and the condition existing at the time of the adoption of the amendment in order to ascertain the mischief to be remedied and the remedy adopted.

*Bryant* v. *English*, 311 Ark. 187, 193, 843 S.W.2d 308, 311 (1992). Moreover, we have said that constitutional provisions should receive a consistent and uniform interpretation and when one interpretation has been followed for a number of years, it should not be changed. *S.W. Ark. Communications, Inc.* v. *Arrington*, 296 Ark. 141, 753 S.W.2d 267 (1988).

It is beyond dispute that the people of Arkansas adopted the new constitution in 1874 in part to gain some control over high property taxes and the assessors who, because they received a percentage of all taxes levied, were apt to place unreasonably high assessments on the value of land. Ralph C. Barnhart, *A New Constitution for Arkansas?*, 17 Ark. L. Rev. 1, 3 (1963-64). The adopted constitution, as a result, prohibited the assessors from taking a percentage of property taxes levied and limited the percentage of taxes that the counties could levy against property. Arkansas Constitution, art 7, § 46; art. 16, § 9. Thus, the mischief to be remedied in 1874 does not apply to the gross receipts tax, and we should interpret the "taxes" referenced in Article 16, § 9, to be limited to ad valorem taxes.

Furthermore, the authority for the ordinance by the Jefferson County Quorum Court is Act 26 of 1981, now codified at Ark. Code Ann. § 26-74-201 *et seq.* (1987 & Supp. 1993), which authorizes the one percent county-wide sales and use tax. That authority, heretofore, has not been called into question. Only now, over one hundred years after the adoption of the 1874 Constitution, does the majority impose constraints on county taxation. These constraints are implausible in light of the history of Article 16, § 9, the mischief intended to be corrected by that section, and the enactment of the gross receipts tax some 67 years later.

I respectfully dissent.

HOLT, C.J., and GLAZE, J., join in this dissent.

PAULA JAMELL STOREYGARD, Special Associate Justice, dissenting. This appeal should be dismissed for lack of subject matter jurisdiction. Mr. Foster alleges that a Jefferson County sales and use tax ordinance violated various constitutional and statutory provisions. He prays for the following relief: (a) declaration that the election which approved the tax be declared null and void; (b) declaration that the county sales and use taxes be declared an illegal exaction; (c) issuance of an injunction against collection of the taxes; and (d) award of "at least nominal damages." The Jefferson County Circuit Court did not have jurisdiction to hear the case.

The jurisdiction of the trial court in this case was not raised by the parties or determined by the trial court. It is well settled, however, that the question of subject matter jurisdiction may be raised for the first time on appeal and that the Supreme Court can raise it on its own. *See Arkansas Department of Human Services* v. *Estate of Hogan,* 314 Ark. 19, 858 S.W.2d 105 (1993); *Drainage District No. 1 of Cross County* v. *Rolfe,* 110 Ark. 374, 161 S.W. 1034 (1913). Indeed, it is the duty of the appellate court to determine if it has jurisdiction of the subject matter. *Mertz* v. *States,* 318 Ark. 390, 885 S.W.2d 853 (1994). This duty is even more important considering that the Supreme Court does not rule on constitutional questions if the case can otherwise be resolved. *Attwood* v. *Estate of Attwood,* 276 Ark. 230, 633 S.W.2d 366 (1982); *Searcy County* v. *Stephenson,* 244 Ark. 54, 424 S.W.2d 369 (1968); *Road Improvement Dist. No. 1* v. *Glover,* 86 Ark.

231, 110 S.W. 1031 (1908). If the trial court did not have subject matter jurisdiction, then the appellate court has no jurisdiction to hear the appeal and should dismiss the case for want of jurisdiction. *See The First Pyramid Life Insurance Co. of America* v. *Reed*, 247 Ark. 1003, 449 S.W.2d 178 (1970).

Jurisdiction must be determined entirely from the pleadings, and if it is not established by the pleadings, the complaint is fatally deficient and the court is not to proceed further. *Vachon* v. *City of Fort Smith*, 308 Ark. 636, 826 S.W.2d 277 (1992). Because subject matter jurisdiction is settled by a review of the pleadings, we must employ the settled rules that (a) a complaint must allege sufficient facts to state a prima facie cause of action over which the trial court has jurisdiction and (b) such a cause cannot be stated by using conclusory language. *McKinney* v. *City of El Dorado*, 308 Ark. 284, 824 S.W.2d 826 (1992). In this case, Mr. Foster has failed to allege he is a citizen of the county or that he is a taxpayer, as required in order to state a prima facie cause of action under Ark. Const., art. 16, § 13. *See Baker* v. *The National Surety Corporation*, 210 Ark. 731, 197 S.W.2d 752 (1946). For this reason alone, subject matter jurisdiction should fail in any court. *McKinney* v. *City of El Dorado, supra.* Jurisdiction in circuit court is particularly lacking, as discussed below.

Article 7, Section 28, of the Arkansas Constitution of 1874 provides that "county courts shall have exclusive original jurisdiction in all matters relating to county taxes . . . ." It has been held that:

> A circuit court could have jurisdiction of a taxation matter such as this, but it would be as a result of Ark. Const., art. 7, § 33, which provides for appeals to be taken from county court to circuit court.

*Scott County* v. *Frost*, 305 Ark. 358, 359, 807 S.W.2d 469, 470 (1991). In spite of the exclusive jurisdiction provision in the constitution, a well settled body of law has developed over the years which establishes that, in order to prevent multiplicity of litigation, chancery courts have jurisdiction to grant the equitable relief necessary to protect against void or illegal county taxes pursuant to Ark. Const., art. 16, § 13. *See Pockrus* v. *Bella Vista Village Property Owners Ass'n*, 316 Ark. 468, 872 S.W.2d 416 (1994);

*Scott County, supra; McIntosh* v. *Southwestern Truck Sales*, 304 Ark. 224, 800 S.W.2d 431 (1990); *Arkansas Ass'n of County Judges* v. *Green*, 232 Ark. 438, 338 S.W.2d 672 (1960); *Rose* v. *Brickhouse*, 182 Ark. 1105, 34 S.W.2d 472 (1931). This recognized exception to the exclusive jurisdiction set forth in Ark. Const., art. 7, § 28, has never been extended to include circuit courts. The majority has cited no decision, and I can find no decision, which holds that a circuit court may hear (except on appeal from county court) an illegal exaction case regarding county taxes.

The majority relies upon Ark. Code Ann. § 26-35-902 (Supp. 1993) to hold that subject matter jurisdiction of illegal exaction suits is concurrent between circuit and chancery courts. I would agree with that holding except to the extent that the constitution dictates otherwise with respect to county matters; a statute cannot alter the jurisdiction granted or withheld by the constitution. *See Young* v. *Jamison*, 309 Ark. 187, 828 S.W.2d 831 (1992). Where county matters are at issue, the forum of the lawsuit is not merely a matter of "propriety," as held by the majority, but a matter of subject matter jurisdiction which cannot be waived or conferred by the parties. As discussed below, the circuit court was without subject matter jurisdiction to grant even one of the four prayers for relief sought by Mr. Foster. Because the circuit court was wholly lacking in jurisdiction, the question of "propriety" is not present in this case. *See Liles* v. *Liles*, 289 Ark. 159, 711 S.W.2d 447 (1986).

In his first prayer for relief, Mr. Foster asked that the election which approved the tax be declared "null and void." In his amended complaint, he asks that "the challenge of the election be upheld." He did not make any allegations regarding the actual conduct of the election nor the validity of the election results. If the complaint is sufficient to state a cause of action regarding the election (and I do not believe that it is sufficient under the reasoning set forth in *Curry* v. *Dawson*, 238 Ark. 310, 379 S.W.2d 287 (1964)), the action would not lie in circuit court. Ark. Code Ann. § 26-74-209(c) requires that any challenge to this particular type of county sales and use tax election be filed in chancery court. It is not necessary for us to determine whether Ark. Code Ann. § 26-74-209(c) is valid under Ark. Const., art. 7, § 28, because, under either law, the circuit court is without subject matter jurisdiction. Although the majority cited many election

cases, it has not cited any decision finding that circuit court has jurisdiction over a county tax election challenge. That is because circuit courts have no such jurisdiction.

Mr. Foster next prays that the county tax be declared an illegal exaction. As discussed above, chancery courts have been granted the only exception to the jurisdictional constraints set forth in Ark. Const., art. 7, § 28, to hear such a case. Even if Mr. Foster has stated a cause of action under Ark. Const., art. 16, § 13, the circuit court does not have jurisdiction to hear this county tax case.

Mr. Foster also prays for an injunction against collection of an illegal exaction. Clearly, this is equitable relief over which original jurisdiction lies solely with the chancery court pursuant to Ark. Const., art. 7, § 15. *See Monette Road Improvement Dist.* v. *Dudley*, 144 Ark. 169, 222 S.W. 59 (1920). *See also* Ark. Code Ann. §§ 16-13-304(a); 16-113-306. It is not necessary to determine whether the two statutes are valid with respect to county matters in light of Ark. Const., art. 7, § 28, because, under either analysis, circuit court would not have original jurisdiction. The majority has cited several decisions in which circuit court jurisdiction over illegal exaction cases was upheld. However, none of these cases involved county taxes so the court did not have to apply the jurisdictional limitations set forth in Ark. Const., art. 7, § 28.

Finally, Mr. Foster prays for "at least nominal damages." Mr. Foster has failed to allege that he has suffered damages or is entitled to a monetary judgment against a county government under any legal theory. Because he has failed to state any facts to support a claim for damages, he has again failed to establish a basis for jurisdiction in circuit court. *McKinney* v. *City of El Dorado, supra.*

As well stated by the majority, the circuit courts have jurisdiction only over these cases for which jurisdiction is not vested exclusively in another court. As shown above, jurisdiction of this county tax case is vested exclusively in county court except to the extent that equity may be sought in chancery court.

The majority should not have reached the merits in this case. Since the circuit court did not have jurisdiction to hear the case, the Supreme Court does not have jurisdiction, and the appeal should be dismissed. I respectfully dissent.

CORBIN, J., joins in this dissent.

## OPINION ON GRANTING OF REHEARING
### JULY 17, 1995
[Rehearing denied September 25, 1995.*]

901 S.W.2d 809

---

*Dudley, Newbern and Corbin, JJ., would grant. Roaf, J., not participating.

116-B

*Bowden Law Firm*, by: *David O. Bowden*, for appellant.

*Bart Mullis* and *Friday, Eldredge & Clark*, by: *J. Shepherd Russell, III* and *R. Christopher Lawson*, for appellee.

ROBERT L. BROWN, Justice. The petition for rehearing is granted, and we affirm the trial court's order of summary judgment in favor of appellee Jefferson County Quorum Court.

On November 23, 1993, a majority of those voting in a Jefferson County election adopted a one cent sales and use tax. On December 28, 1993, appellant Jack Foster challenged the new tax by filing a declaratory judgment action in which he contended that the new tax violated Article 16, § 9, of the Arkansas Constitution, which reads:

> No county shall levy a tax to exceed one-half of one percent for all purposes, but may levy an additional one-half of one percent to pay indebtedness existing at the time of the ratification of this Constitution.

Foster further alleged that the ordinances[1] establishing the tax were not appropriately introduced, failed to have the Enactment Clause in the title, and failed to include a statutory rebate. He prayed for a declaratory judgment that the election be declared null and void.

Subsequently, Foster filed an amended complaint, and the Quorum Court answered and moved for summary judgment. Foster then filed a cross motion for summary judgment. The circuit court reviewed the matter, granted summary judgment in favor of the Quorum Court, and dismissed the complaint with prejudice. Because the circuit court did not exclude matters submitted outside the pleadings, including affidavits, in its consideration, we treat the order as one for summary judgment and not a dismissal under Ark. R. Civ. P. 12(b)(6). *See* Ark. R. Civ. P. 12(b); *Godwin* v. *Churchman*, 305 Ark. 520, 810 S.W.2d 34 (1991).

### I. Article 16, § 9

There are four points on appeal. The first point deals with the interpretation of Article 16, § 9, of the Arkansas Constitution

---

[1]Though Foster refers to two ordinances in his Complaint —No. 1993-74 and No. 1993-75 — it is Ordinance No. 1993-74 that was the focus of the litigation and the appeal.

and whether that section forecloses the counties from levying a one cent sales and use tax. We conclude that the one percent sales and use tax adopted in Jefferson County does not run afoul of the Arkansas Constitution.

A brief discussion of the history of Article 16 is instructive on this point. Article 16 was part of the Arkansas Constitution adopted by vote of the people on October 13, 1874. The only tax specifically referred to in the Article is the ad valorem property tax:

§ 5    Property is taxed according to value.

§ 6    Laws exempting property from taxation, other than as provided in the Arkansas Constitution, are void.

§ 7    Power to tax corporations and corporate property shall not be suspended.

§ 8    Legislative power to levy State taxes for any year is limited and may not exceed, in the aggregate, 1% of the assessed value of the property of the State for that year.

Amendment 59 of 1980, which was adopted by vote of the people on November 4, 1980, amended § 5 of the Article and added the following sections, all of which concern ad valorem property taxes:

§ 14    Procedure for adjustment after reappraisal and reassessment of property is established.

§ 15    Assessment of residential property and of agricultural, pasture, timber, residential and commercial land are distinguished.

§ 16    A legislative exemption from property taxes is authorized for a residence of a person over the age of 65 up to a value of $20,000.

Thus, Article 16, as originally adopted by vote of the people, and as amended as recently as 1980, makes specific reference only to property taxes. In addition, § 9 follows behind, and is part of, four sections which have taxation of *property* as their subject matter.

Sixty-one years after ratification of the 1874 Arkansas Constitution, the Arkansas General Assembly passed its first sales tax — the Arkansas Emergency Retail Sales Tax Act — to be in force for a period of two years. *See* Act 233 of 1935. By means of Act 386 of 1941, now codified at Ark. Code Ann. § 26-52-101 *et seq.* (Repl. 1992 & Supp. 1993), a permanent gross receipts tax, or sales tax, was enacted. The question then becomes whether the tax referenced in Article 16, § 9, is limited to the property tax or whether the term embraces other taxes like the one percent sales and use tax adopted in Jefferson County. That one percent sales and use tax was authorized by Act 26 of 1981, now codified at Ark. Code Ann. §§ 26-74-201 *et seq.* (1987 & Supp. 1993). Act 26 was enacted to facilitate capital improvements and bond financing. Since its enactment, the validity of Act 26 has not been contested as violative of Article 16, § 9, although it has been the subject of litigation. *See, e.g., City of Little Rock* v. *Waters*, 303 Ark. 363, 797 S.W.2d 426 (1990); *Ragan* v. *Venhaus*, 289 Ark. 266, 711 S.W.2d 467 (1986).

■ We turn to our rules of constitutional construction and interpretation in analyzing Article 16, § 9. Our primary goal in construing and interpreting a constitutional provision is to ascertain and give effect to the intent of the Arkansas people. *Knox* v. *Williamson*, 241 Ark. 455, 408 S.W.2d 501 (1966). There is also the rule that we give language its plain and ordinary meaning. *Gritts* v. *State*, 315 Ark. 1, 864 S.W.2d 859 (1993); *Mountain Home School Dist. No. 9* v. *T.M.J. Builders, Inc.*, 313 Ark. 661, 858 S.W.2d 74 (1993); *Omega Tube & Conduit Corp.* v. *Maples*, 312 Ark. 489, 850 S.W.2d 317 (1993). When engaging in constitutional construction and interpretation, we look to the history of the constitutional provision and to the mischief intended to be corrected by its passage:

> In interpreting constitutional amendments, we have said that a court, in order to determine the meaning and the extent of coverage of a constitutional amendment, may look to the history of the times and the condition existing at the time of the adoption of the amendment in order to ascertain the mischief to be remedied and the remedy adopted.

*Bryant* v. *English*, 311 Ark. 187, 193, 843 S.W.2d 308, 311 (1992).

Finally, the Arkansas Constitution must be considered as a whole and to get at the meaning of any part of it, we must read the provision in the light of other provisions relating to the same subject matter. *Wells* v. *Riviere*, 269 Ark. 156, 599 S.W.2d 375 (1980), *quoting Chesshir* v. *Copeland*, 182 Ark. 425, 32 S.W.2d 301 (1930).

The people of Arkansas adopted the new constitution in 1874 in part to gain control over high property taxes and the county tax assessors who, because they received a percentage of all taxes levied, were apt to place unreasonably high assessments on the value of land. Ralph C. Barnhart, *A New Constitution for Arkansas?*, 17 Ark. L. Rev. 1, 3 (1963-64). The 1874 Constitution, as a result, prohibited the assessors from taking a percentage of property taxes levied and limited the percentage of taxes that the counties could levy against property. Arkansas Constitution, art 7, § 46; art. 16, § 9. Thus, the mischief to be remedied in 1874 related solely to the property tax, and the remedy incorporated into the 1874 Constitution applied solely to the property tax.

Early on, this court recognized this interpretation when it stated that "sections eight (8) and nine (9) of the same article [Article 16] refer to limitations of taxation by the state and county upon *property* as such, and have no reference to license taxes." *City of Little Rock* v. *Prather*, 46 Ark. 471, 478 (1885). (Emphasis added). Two recent cases lend credence to this interpretation of Article 16, § 9. *See Quapaw Central Business Improvement Dist.* v. *Bond-Kinman, Inc.*, 315 Ark. 703, 870 S.W.2d 390 (1994); *Holt* v. *City of Maumelle*, 302 Ark. 51, 786 S.W.2d 581 (1990). In the *Quapaw Central* case, which involved assessments by a local improvement district and bond financing, we emphasized that Article 16 applied to property taxes and did not limit special improvement assessments:

> The Arkansas Constitution of 1874 contains provisions limiting the maximum rate of general *property* taxation by counties and municipalities, and prohibiting counties and municipalities from issuing interest-bearing certificates of indebtedness. *See generally* Ark. Const. art. 16 as amended. Because these constitutional restrictions do not apply to improvement districts, the improvement district has been

used in Arkansas as a means of constructing and financing large public improvements that counties and municipalities could not normally afford. [citing *Sloan, A Treatise on the Law of Improvement Districts in Arkansas*, pp. 2-28 (1928)]

315 Ark. at 706, 870 S.W.2d at 392. (Emphasis added.) In *Holt v. City of Maumelle, supra,* we considered a municipal ordinance and the issue of whether a monthly charge on certain housing was a property tax within the meaning of Article 12, § 4 of the Arkansas Constitution. We stated:

"Further, in 1883, the only taxes of consequence were taxes on property, and the provisions of Act 114 should be construed keeping in mind the historical context and the taxing alternatives and conditions existing at the time of enactment. (citing authority)"

*Holt,* 302 Ark. at 54, 786 S.W.2d at 583. Thus, the *Quapaw Central* case is illustrative of this court's ongoing treatment of Article 16 as limiting county levies only on property taxes. The *Holt* case expresses our commitment to view specific tax levies in a historical context.

■ This court has made it clear that constitutional provisions should receive a consistent and uniform interpretation and when one interpretation has been followed for a number of years, it should not be changed. *S.W. Ark. Communications, Inc. v. Arrington,* 296 Ark. 141, 753 S.W.2d 267 (1988). Cases from this court which have cited Article 16, § 9 since the adoption of the 1874 Constitution have all been cases which touch and concern property taxes and no other means of taxation. *See, e.g., Sherrill v. Faulkner,* 200 Ark. 1006, 142 S.W.2d 229 (1940); *Gaither v. Gage & Co.,* 82 Ark. 51, 100 S.W. 80 (1907); *Doniphan Lumber Co. v. Reid,* 82 Ark. 31, 100 S.W. 69 (1907); *Desha County v. Chicot County,* 73 Ark. 387, 84 S.W. 625 (1904); *Cope v. Collins,* 37 Ark. 649 (1881); *Lee County v. State,* 36 Ark. 276 (1880); *Graham v. Parham,* 32 Ark. 676 (1878).

We are aware that § 11 of Article 16, which prohibits taxes generally that are raised for one purpose from being used for another purpose, and § 12 of Article 16, which precludes payment of money from the State Treasury unless appropriated, have

been analyzed together by way of *dictum* as applying to all taxation and not just to property taxes. *See Collins* v. *Humphrey*, 181 Ark. 609, 27 S.W.2d 102 (1930). That analysis, however, does not control our interpretation and construction of § 9. Section 9 expressly and specifically limits county tax levies to one-half of one percent and follows in the wake of sections 5, 6, 7, and 8, all of which relate to property taxes. Most importantly, the intent of the people in 1874 to limit property taxes by adopting § 9 is beyond dispute.

■ In sum, we conclude that it was the ad valorem property tax that exclusively concerned both the framers of the Arkansas Constitution and the voters in 1874, and not a tax on retail sales, such as that enacted some 60 years later. Both the historical context of the 1874 Constitution and the subject matter of Article 16 make that clear. We hold that Article 16, § 9, limits county tax levies to the ad valorem property tax and that it does not fix a limit on the one percent sales and use tax adopted in Jefferson County on November 23, 1993.

## II. Invalidity of Sales Tax Ordinance

We turn next to the three points raised by appellant Jack Foster which concern the invalidity of the Jefferson County ordinance authorizing the sales and use tax. We can dispose of two of the points for the same reason. Foster urges (1) that the ordinances were introduced by the County Judge and not by a Justice of the Peace, as required by Ark. Code Ann. § 14-14-905(a) (1987); and (2) that the Enactment Clause language in Ordinance 1993-74 was not in the title, as required by Ark. Code Ann. § 14-14-905(b) (1987).

■ We underscore again that the ordinance has now been passed by a vote of the people of Jefferson County. We further observe that a Justice of the Peace reported successful committee action on the ordinance to the full Quorum Court at the October 11, 1993 meeting, and a second Justice of the Peace recommended a "Do Pass." Regarding the Enactment Clause, Ordinance No. 1993-74 did contain the required language, though not in the title. We view both matters as substantial compliance with the statutory requirements, especially in light of the fact that the ordinances have been approved by a vote of the people. *See Vandiver* v. *Washington County*, 274 Ark. 561, 628 S.W.2d 1 (1982).

As we stated in *Vandiver*, quoting from *Orr* v. *Carpenter*, 222 Ark. 716, 262 S.W.2d 280 (1953), preelection provisions of the election law are directory only after the election and not mandatory unless proclaimed to be essential by the governing statute or unless they are of such a character as to affect the election result. Neither circumstance applies here.

■ Foster also argues that Ordinance 1993-74 fails to comply with the rebate mandated by Ark. Code Ann. § 26-74-213(a) (Supp. 1993), for taxes collected in excess of the tax on the first $2,500 of the sales price. The Quorum Court counters that Ordinance 1993-74 provides that the tax is only levied "on the first $2,500 for each single transaction." As a consequence, no rebate is necessary. That approach by the Quorum Court obviates the need for a rebate provision. We find no basis for reversal on this point.

■ For his last point, Foster maintains that the Jefferson County ordinance is invalid because it fails to comply with the dictates of Act 885 of 1991, now codified at Ark. Code Ann. § 26-74-401 *et seq.* (Supp. 1993), for counties without an existing one percent sales and use tax. The ordinance at issue, however, was passed by the Quorum Court under the authority of Act 26 of 1981, codified at Ark. Code Ann. § 26-74-201 *et seq.* (1987 & Supp. 1993). This argument, accordingly, has no merit.

For the reasons stated, the order granting summary judgment to the Jefferson County Quorum Court is affirmed.

GLAZE, J., and Special Justice PAULA JAMELL STOREYGARD concur.

DUDLEY, NEWBERN, and CORBIN, JJ., dissent.

ROAF, J., not participating.

TOM GLAZE, Associate Justice, concurring. The initial prevailing opinion in this cause interpreted Ark. Const. art. 16, § 9, which reads, "No county shall levy a tax to exceed one-half of one percent for all purposes." The opinion stated that Jefferson County's ordinance, approved by the voters, violates art. 16, § 9, because it imposes a one percent sales tax, exceeding the one-half of one percent limit provided by the Article 16 provision. This statement or holding is incorrect, however, if the constitu-

tional framers of Article 16 intended only to apply the one-half of one percent limit to *property* taxes — an intention which seems abundantly clear when one reads other sections contained in Article 16. *E.g.* Section 5 (all *real and tangible personal property* taxed according to its value); Section 6 (all laws exempting *property* from taxation other than as provided in the Constitution shall be void); Section 7 (provides for taxation of corporate *property*); Section 8 (establishes maximum rate — one percent of *assessed valuation of the property* — state can levy taxes).

Although not previously cited by any party, this court in its recent decision of *Quapaw Cent. Business Improvement Dist.* v. *Bond-Kinman, Inc.*, 315 Ark. 703, 870 S.W.2d 390 (1994) made it very clear that the *Article 16 provisions* of the Arkansas Constitution *limited* the maximum rate of *general property taxation by counties and municipalities*. Nonetheless, this court still held such restrictions do not apply to improvement districts created by governmental entities. We pointed out that improvement districts have been used in Arkansas as a means of constructing and financing large public improvements that counties and municipalities could not normally afford. *See* Horace Sloan, *A Treatise On The Law of Improvement Districts In Arkansas* (1928) § 16.

In sum, this court in the *Quapaw Improvement District* case approved Little Rock's creation and use of an improvement district as a mechanism to raise monies through property assessments to improve a geographical segment of its municipality. In doing so, this court was fully aware of the Article 16 constitutional restrictions imposed upon counties and municipalities, but the court still allowed such governmental entities the authority to finance needed improvements by a method other than directly increasing general property taxes. Surely if this court recognizes that a local governmental entity may obtain monies or financing through improvement district assessments, such an entity, authorized by the General Assembly and the electorate, should be permitted revenues or financing by use of a sales tax.

Consistent with the underlying rationale this court employed in *Quapaw Improvement District*, a county or municipal sales tax simply does not fall within the property tax proscriptions or limitations of Article 16. Like improvement district assessments, sales taxes were not in existance when the 1874 Article 16 prop-

erty tax restrictions were adopted. Sales taxes approved by the voters provide yet another or alternative means by which the state, counties and municipalities may finance their governmental functions.

For the foregoing reasons, I join the majority court in granting a rehearing and affirm the trial court's decision.

PAULA JAMELL STOREYGARD, Special Associate Justice, concurring. The Appellee's petition for rehearing should be granted. Appellees correctly argue, for their first point, that the purported majority opinion actually consisted of only two votes. Appellees also correctly argue, for their second point, that the purported majority opinion contains an error of law in its interpretation of Ark. Const., art. 16, § 9. There is no need to address their third point regarding clarification of the purported majority opinion.

## Point I

Of three Justices reported to have joined the original opinion of Justice Dudley, two actually dissented on grounds that the Court (a) had no jurisdiction to hear this case, (b) should not have reached the merits, and (c) should have dismissed the appeal. Their views on constitutionality should not have been counted with either the "majority" or "dissenting" opinion. This Court has previously recognized that a justice may dissent for lack of jurisdiction and not reach the merits of a case. *See Amalgamated Clothing* v. *Earle Industries, Inc.*, 318 Ark. 524 (1994); *Arkansas Association of County Judges* v. *Green*, 232 Ark. 438, 338 S.W.2d 672 (1960).

The decision in this case should originally have been reported as three to affirm, two to dismiss, and two to reverse. The case should, therefore, have been affirmed pursuant to the general rule that when no majority opinion can be reached, the case must be affirmed. *See Neil* v. *Biggers*, 409 U.S. 188 (1972); *Durant* v. *Essex Co.*, 74 U.S. 107 (7 Wall. 107) (1869); *Richardson* v. *Carnegie Library Restaurant, Inc.*, 763 P.2d 1153 (N.M. 1988); *People* v. *Young Women's Christian Ass'n. of Springfield*, 387 N.E.2d 305 (Ill. 1979); *Indianapolis Newspapers, Inc.* v. *Fields*, 259 N.E.2d 651 (Ind. 1970); *In re Levine*, 88 A.2d 104 (Pa. Super. 1952); *Durbin* v. *Humphrey Co.*, 28 N.E.2d 563 (Ohio 1940); *Fontaine* v. *Maineland Stages*, 180 A. 314 (Me. 1935). This Court

adopted that rule in *Bernard & Leas Mfg. Co.* v. *Smith*, 77 Ark. 590 (1906), when it held that an equally divided court will leave the finding of the trial court in place.

I would grant rehearing based on Appellee's Point I.

### Point II

The majority of the Court declines to grant rehearing based upon Appellant's Point I. Therefore, in order to avoid any issue regarding the effect of a jurisdictional dissent when no majority can be reached on the merits, I withdraw my prior dissent and turn to the merits of this case. After reviewing the several briefs submitted in favor of rehearing, I find that the sales tax at issue is constitutional and that the Appellant has otherwise failed to demonstrate that the sales tax is invalid.

The meaning of Ark. Const., art. 16, § 9, has previously been interpreted in a series of cases which had not been originally cited by any party. It is, therefore, unnecessary to engage in the tortuous process of constitutional construction. In *City of Little Rock* v. *Prather*, 46 Ark. 471 (1885), the Court interpreted this constitutional provision to "refer to limitations of taxation by the . . . county upon property as such, and [to] have no reference to license taxes." *Id.*, 46 Ark. at 478. That interpretation was generally repeated in *Quapaw Central Business Improvement Dist.* v. *Bond-Kinman, Inc.*, 315 Ark. 703, 870 S.W.2d 390 (1994) and *Holt* v. *City of Maumelle*, 302 Ark. 51, 786 S.W.2d 581 (1990). According to the interpretation of Ark. Const., art. 16, § 9, which has consistently been made by this Court, that provision does not limit county sales tax rates. It is well established that constitutional provisions "should receive a consistent and uniform interpretation so that they will not be taken to mean one thing at one time, and a different thing at another." *O'Daniel* v. *Brunswick Balke Collender Co.*, 195 Ark. 669, 674, 113 S.W.2d 717, 719 (1938).

I therefore join with Justice Brown to grant rehearing on Appellee's Point II and to affirm the trial judge.

ROBERT H. DUDLEY, Justice, dissenting. The majority opinion holds that Jefferson County can validly adopt a one percent sales and use tax. I respectfully dissent.

I.

Article 16, section 9, of the Constitution of Arkansas provides: "No county shall levy a tax to exceed one-half of one percent for all purposes, but may levy an additional one-half of one percent to pay indebtedness existing at the time of the ratification of this Constitution." The second clause of this section refers to a tax of one-half of one percent to pay debts that existed in 1874, the year the constitution was ratified. There is no debt left from 1874, and, consequently, the second clause is no longer valid. The only part of the section that still is in operation is the first clause, "*No county shall levy a tax to exceed one-half of one percent for all purposes.*"

"The first rule of construction is that where the language used in a Constitution is plain and unambiguous, the court *cannot* seek other aids of interpretation." *Ellison* v. *Oliver*, 147 Ark. 252, 264, 227 S.W. 586, 589 (1921) (emphasis supplied). In its answer, Jefferson County admitted that the tax was "for all purposes." The word "county" refers to the governmental unit upon which "a tax" limit is placed, and "one-half of one percent" is the limit imposed. The clear meaning of Article 16, section 9, is that a tax in excess of one-half of one percent tax for all purposes is unconstitutional. When the meaning of a constitutional provision is certain, courts should apply that meaning. *Rockefeller* v. *Hogue* 244 Ark. 1029, 429 S.W.2d 85 (1968).

The majority opinion cites neither an ambiguous word nor a vague phrase, yet resorts to rules of construction to interpret the meaning of the clause. The procedure is contrary to our settled law that neither rules of construction nor rules of interpretation may be used to defeat the clear and certain meaning of a constitutional provision and that courts should not resort to extrinsic facts to alter the plain meaning of the language used. *Bishop* v. *Linkway Stores, Inc.*, 280 Ark. 106, 655 S.W.2d 426 (1983); *see also Kervin* v. *Hillman*, 226 Ark. 708, 292 S.W.2d 559 (1956); *Ellison*, 147 Ark. at 264, 227 S.W.2d at 589.

Even though rules of construction should not be applied when the meaning of the language is clear, the majority opinion does so and misconstrues the clause. The fundamental purpose in applying rules of construction to a constitutional provision is to ascertain and give effect to the intent of the framers and of the

people who adopted it. *Kervin* v. *Hillman*, 226 Ark. 708, 292 S.W.2d 559 (1956). One way to determine that intent is to look at the comparable provisions of our earlier constitutions. *See Ferrill* v. *Keel*, 105 Ark. 380, 151 S.W. 269 (1912).

There was no comparable provision limiting the taxing powers of the counties in the 1836 Constitution, often labeled the "Statehood Constitution." In the pertinent parts it provided, "All revenues shall be raised by taxation to be fixed by law," and "No other or greater tax shall be levied on the productions or labor of the country than may be required for expenses of inspection." Ark. Const. of 1836, art. VII, Revenue §§ 1 and 4. Under these provisions counties could enact various taxes since "local taxes for county or municipal purposes might well be authorized, if self-imposed, according to the discretion of the people of such county or town, through their magistrates or officers elected by and directly responsible to them." *Washington* v. *State*, 13 Ark. 752, 761 (1853). The 1861 Constitution, or the "Secession Constitution," contained the same provisions, but added another that said county courts "shall have jurisdiction in all matters relating to county taxes, disbursements of money for county purposes, and in every other case that may be necessary to the internal improvement and local concerns of the respective counties." Ark. Const. of 1861, art. VI, § 11. The 1864 Constitution, or the "Military Constitution," contained the same provisions as did the 1861 Constitution. Under it the government "proceeded to levy taxes on carriages, tanyards, distilleries and other industries, jewelry, gold watches *and incomes over $600.*" Ralph C. Barnhart, *A New Constitution for Arkansas?* 17 Ark. L. Rev. 1, 2 (1963-64) (emphasis added).

The 1868 Constitution, or the "Reconstruction Constitution" and at times called the "Carpetbagger Constitution," did not contain the provision about county courts having jurisdiction in matters relating to county taxes, and did not contain a limit on county taxes. Article X provided for imposing various taxes, and they were not limited to property taxes. *See* Ark. Const. of 1868, art. X, §§ 2, 3, 4 and 5. This constitution existed during a period of governmental irresponsibility. The period is described by Professor Barnhart as follows:

> The constitution of 1868 was the so-called carpetbag constitution. The new governor elected under it was a

Republican, or at least a turn-coat Democrat, and it goes without saying that the administration did not have local organizations to carry out its functions throughout the state. Of necessity it was a centralized government in great measure. Under the constitution of 1868 the governor appointed a commissioner of public works and internal improvements who had supervision of all internal improvements and was also *ex officio* commissioner of immigration and of state lands. The governor appointed tax assessors, prosecuting attorneys, and township and precinct officers. He appointed the Chief Justice of the Supreme Court and all inferior judges. Objective judgments are hard to come by, but it can be imagined that the appointments were unpopular. We are told that the government was wasteful and levied extravagant taxes. Assessors who were naturally kept under control of the administration received a percentage of all taxes levied, so it is said "this was a very great stimulus to place the highest assessment upon all property." Not only were heavy taxes levied, but bonds were issued by the state in large amounts to railroads, to pay for supplies furnished to the militia and to raise money for treasury deficits, and the governor's assessors were also given authority to appoint the judges and clerks of elections in the counties. While the people were thus oppressed by what they termed confiscatory taxes, the office holders flourished and had the bad taste to flaunt their prosperity by building palatial homes on what became known as Carpetbag Row in Little Rock. In time the Democrats began to take the oath prescribed by the 1868 constitution and as required under the reconstruction law and to register and vote. By 1874 probably most of them had regained the franchise and the demand for a new constitution became overwhelming. The legislative act submitting the issue to the people noted "that it is manifest that there are many defects and objectionable provisions in the present constitution of the state and it is not satisfactory to the people thereof." This is probably the understatement of the Nineteenth Century. The vote for a constitutional convention was about 80,000 for, 8,500 against.

It is not surprising that the delegates to the 1874 con-

vention were bent on including a plentiful supply of "thou shalt nots." It is evident that they were determined to cut down the governor's power, for they reduced the term of office from four to two years. We can understand why the original article 6, sec. 3, made specific provision for sealing up the returns of the election of executive officers and transmitting them to the Speaker of the House of Representatives, who should open them in the presence of both houses of the General Assembly and publish the votes cast. The salaries of the governor and other public officials including judges were fixed in the new constitution. County officers were to be elected, and it was specifically provided that no percentum should ever be paid to assessors upon the valuation or assessment of property by them. The General Assembly itself was limited in the rate of taxes that might be levied, as were counties and municipalities, and loan of public credit by state, county, city or other municipalities was prohibited. Counties and municipal corporations were barred from becoming stockholders in any corporation. Personal and homestead exemptions for debtors and other exemptions were specifically set out. In short, the constitution reflected distrust of the executive, the legislative and the judicial branches of the government and kept controls to a very great extent in the hands of the people. The "Thou shalt nots" were liberally extended to all three branches of the state government. The constitution of 1874 was a reaction against the government which preceded it with all of the abuses and dissatisfactions fresh in mind. The eyes of the draftsmen were on an immediate and unhappy past and not upon the visions of a new world.

17 Ark. L. Rev. at 3-4 (footnotes omitted).

The framers and people intended to put an end to all governmental excesses with the present, or 1874 Constitution. The present constitution, unlike earlier ones, expressly limits taxation by the counties. The limit on counties is that no county shall levy a tax to exceed one-half of one percent for all purposes. The majority opinion construes this limit to apply only to property taxes.

In determining the intention of the framers and of the peo-

ple who adopted the constitution, a court should look to the history of the times as well as the provisions of the earlier constitutions to determine the mischief that was to be remedied, and, in consideration of all of these things, arrive at the intention of the drafters and people in adopting the constitution. *Carter* v. *Cain*, 179 Ark. 79, 14 S.W.2d 250 (1929). The history of the times, recited above, shows the dissatisfaction of the people with the government and the mischief that the drafters and people intended to correct. In 1878, only four years after the present constitution was adopted, in discussing the provision now at issue, this court wrote:

> With regard to counties, which, in this Constitution are treated separately, it is provided, (Art. XVI., Sec. 9), that "no county shall levy a tax to exceed one-half of one per cent for all purposes; but may levy an additional one-half of one per cent to pay indebtedness existing at the time of the ratification of this Constitution."
>
> Upon a careful consideration of these provisions, in connection with the history of the State, and the existing evils which the Convention of 1874 had probably in view, as resulting from the improvidence and recklessness of counties, cities and towns, in the creation of debts, we conclude that it was the *intention of that body to cut off utterly all power to levy taxes beyond the limits assigned.*

*Brodie* v. *McCabe*, 33 Ark. 690, 696 (1878) (emphasis added).

This was our interpretation in 1878. The majority opinion changes the clause from its original meaning, which is "to cut off utterly all power to levy taxes beyond the limits assigned" to now mean that there is no limit on any county taxes except for the limit on the property tax.

> A cardinal rule in dealing with written instruments is that they are to receive an unvarying interpretation, and that their practical construction is to be uniform. A Constitution is not to be made to mean one thing at one time and another at some subsequent time when the circumstances may have so changed as perhaps to make a different rule in the case seem desirable.

*Carter*, 179 Ark. at 85, 14 S.W.2d at 253 (quoting 1 Thomas M.

Cooley, *A Treatise on the Constitutional Limitations*, at 124 (8th ed. 1927)).

Under the majority opinion, counties, when authorized by the General Assembly, can now enact sales taxes, use taxes, income taxes, value added taxes, severance taxes, estate taxes, gift taxes, transfer taxes, excise taxes, license taxes, privilege taxes, occupation taxes, and every other kind of tax, except property taxes, *without any limit whatsoever*. That result is not a fair interpretation of the intent of the framers and the people who adopted the constitution in 1874.

A part of the rationale used in applying the rules of construction in the majority opinion is that the sales tax was not enacted until the 1930's, and Article 16 is greatly concerned with property taxes. Neither explanation will fairly justify the result reached.

The sales tax was known at the time of the adoption of the present constitution, the Constitution of 1874. William Blackstone in his landmark *Commentaries on the Law* states that there were such taxes in England as early as 1643, or 231 years before the adoption of the present constitution. 1 William Blackstone, *Commentaries on the Law*, Ch. 8 at 319, 319 n.i. (2d ed. 1766).

In this State, sales taxes are recognized as excise taxes. *Hardin* v. *Vestal*, 204 Ark. 92, 162 S.W.2d 923 (1942); *Wiseman* v. *Phillips*, 191 Ark. 63, 84 S.W.2d 91 (1935). Excise taxes were operational in other states at the time the present constitution was adopted. In 1868, or six years before the present constitution was adopted, the Supreme Court of the United States, in deciding a case from Alabama, held that a uniform tax imposed by a state on *all* sales made within that state, whether they be made by one of its citizens or a citizen of some other State, and whether the goods sold are the produce of that state enacting the law or some other state, is valid. *Woodruff* v. *Parham*, 8 Wall 123 (1868). In the same session, the Court also decided *Hinson* v. *Lott*, 8 Wall 148 (1869), and upheld an Alabama tax on the sale of liquor. The previous year, it struck down similar taxes in Nevada and Louisiana. *Steamship Co.* v. *Portwardens*, 6 Wall 31 (1867); *Crandall* v. *Nevada*, 6 Wall 35 (1867). During the same period, other states' appellate courts were considering the validity of some of the other types of excise taxes mentioned in *Blackstone's Commentaries*. For example, four states enacted liquor license taxes in the same period. *See State* v. *Bennett*, 19 Neb. 191 (1886);

*Kitson* v. *Ann Arbor*, 26 Mich. 325 (1873); *Block* v. *Town of Jacksonville*, 36 Ill. 301 (1865); and *Autlanier* v. *The Governor of Texas*, 1 Tex. 653 (1848). Thus, it seems only reasonable to conclude that the drafters of the present constitution were aware of and contemplated an excise tax when writing the document. In addition, it would seem, without dispute, that the drafters were aware of taxes, other than property taxes, because a statute in existence at that time provided:

> Sec. 153 There shall be levied and collected as a county tax the sum of twenty-five dollars on each and every hawker or peddler, whether by land or water, for the privilege of hawking and peddling goods, wares and merchandise in any county in this state for the term of six months or less.

> Sec. 154 There shall be levied and collected as a county tax the sum of ten dollars for each and every auctioneer for the privilege of selling any lands, goods, wares and merchandise at public outcry in any county of this state for the term of six months or less.

> Sec. 155 There shall be levied and collected as a county tax the sum of one hundred dollars on each and every circus or menagerie for each day's exhibition given in any county in this state.

> Sec. 156 There shall be levied and collected as a county tax the sum of five dollars for each public exhibition given in any county in this state by any person or persons, for personal profit.

> Sec. 157 There shall be and is hereby levied and collected, as a state tax, the sum of one hundred dollars, for the use and benefit of the sinking fund, which shall be paid in the lawful money of the United States, and the further sum of one hundred dollars as a county tax, from each and every person *selling*, either at wholesale or retail, any ardent or vinous liquors, it being an occupation of no real use to society (except the same is sold exclusively for medicinal purposes), in any county of this state for the term of one year or less, *i.e.* for the calendar year, or any part thereof.

Act No. 124 of 1873, §§ 153–157 (emphasis added).

Thus, the framers, many of whom were lawyers, surely knew

of the court decisions and statutes involving various kinds of taxes. The eyes of the framers were on an immediate and unhappy past, and they intended to limit the power of governments to limit all taxes, not just property taxes.

Article 16 contains 16 sections, ranging from "Lending credit — Bond issues — Interest-bearing warrants" in section 1, and "Debts of state — Payment" in section 2, to "Providing for exemption of value of residence of persons 65 or over" in section 16. The majority opinion states that the other sections referring to taxes mention only the property tax and from that it infers that section 9 must also refer to a property tax. The majority opinion is correct when it states that other sections refer to property taxes. Section 8, titled the "maximum rate of state taxes," specifically provides that the State is limited to "the aggregate of one percent of the assessed valuation *of the property* of the State for that year." Thus, it is clear that the framers knew how to refer to the property tax, and to restrict the limit on it alone, and they did so when referring to a state property tax, but they did not do so in section 9, when they placed the taxation limit on counties. Rather, they clearly wrote that counties cannot levy "a tax to exceed one-half of one percent for all purposes." Ark. Const. art. 16, § 9.

The majority opinion also cites the case of *Quapaw Cent. Business Improvement Dist.* v. *Bond-Kinman, Inc.*, 315 Ark. 703, 870 S.W.2d 390 (1994) as some authority that the limit provided in section 9 applies only to property taxes. However, that case involved an improvement district, and the present constitution does not limit improvement districts the same as it does counties and cities. *Keel* v. *Board of Directors of St. Francis Levee Dist.*, 59 Ark. 513, 27 S.W. 590 (1894).

## II.

The majority opinion contains a second fundamental mistake. The majority opinion utilizes rules of construction to change the meaning of Article 16, section 9, to limit property taxes only, and, by deductive reasoning, assumes that the tax at issue is not limited. The deductive reasoning contains a fallacious assumption: It assumes that the sales and use tax is not a property tax. However, the use tax is a property tax. *Mann* v. *McCarroll* 198 Ark. 628, 130 S.W.2d 721 (1939). Thus, the limitation on property taxes applies to the use tax in this case, and the ordinance does

not contain a severance clause. Thus, even if the use tax might be severed from the sales tax, it must fail in this particular case.

## III.

The special justice joined in the original opinion, but now changes and joins in the grant of rehearing. In Part I of the concurring opinion, the special justice writes that the decision in the original opinion should have been to affirm, with three votes to affirm, two to dismiss, and two to reverse. The statement is mistaken. The two votes to dismiss were based upon a perceived lack of subject-matter jurisdiction in the circuit court. We held, five to two, that circuit court had jurisdiction. At that point, the appeal was validly in this court from the circuit court, and the case was therefore ready to be decided on its merits. The jurisdictional issue was decided by that holding. It was ended. We then took up the merits of the case, and the special justice joined with the majority in deciding the merits of the case in the original opinion. The vote on the merits was four to reverse and three to affirm. In Part II of the special justice's concurring opinion, she explains the reasons she now changes her vote on the merits. It is the duty of a judge to change his or her vote upon rehearing if he or she thinks his or her original vote was in error, and not one of us has any criticism of a judge who so changes his or her vote.

Even so, the change in the vote and the resulting new majority opinion, do not necessarily end the issue, even in this case. The taxpayer, Foster, can now file his only petition for rehearing, *see Register* v. *Oaklawn Jockey Club, Inc.*, 306 Ark. 318, 321-A, 821 S.W.2d 475 (1991) (supplemental opinion denying rehearing). Submissions for this term have ended, and the petition, if filed, will be submitted upon the opening next "October" term, *see* Ark. Code Ann. § 16-11-101 (1987). When the new term opens, the composition of this court will be changed because the Chief Justice has submitted his notice of resignation effective before the next term begins. In addition, appeals from other cases involving the same issue will most likely reach this court, and most likely they will be decided by the regular justices, and, even if a justice, or justices, should disqualify, and a special justice, or justices, should be appointed, the composition of the court probably would be different.

## IV.

Each of us is aware of the critical financial importance this case has to the counties, but this case does not involve a matter of expediency; rather, it involves a matter of constitutional law. The framers of the 1874 Constitution, and the people who approved it, did not write that, except for the property tax, counties can levy all types or kinds of taxes *without any limits*, and they never intended for such a construction of the constitution to be adopted by this court. It is basic that a constitutional democracy must follow its constitution..

We have faced similar situations in recent years. After we held the clear language of the constitution placed a limitation on the power of cities to incur bonded indebtedness, the people changed the constitution by adopting Amendments 62 and 65 to the Constitution of Arkansas. *See City of Hot Springs* v. *Creviston*, 288 Ark. 286, 705 S.W.2d 415 (1986); *City of Hot Springs* v. *Creviston*, 288 Ark. 286, 293-A, 713 S.W.2d 230 (1986) (supplemental opinion denying rehearing); *Purvis* v. *City of Little Rock*, 282 Ark. 102, 667 S.W.2d 936 (1984); *Purvis* v. *Hubbell*, 273 Ark. 330, 620 S.W.2d 282 (1981). We should again follow the clear language of the constitution, and then if the people want to change it, they can so do.

Newbern and Corbin, JJ., join in this dissent.

---

SEPARATE OPINION DENYING MOTION
REQUESTING DISQUALIFICATION
SEPTEMBER 25, 1995

906 S.W.2d 314

PAULA JAMELL STOREYGARD, Special Justice. I was appointed to act as a Special Justice on this case as a matter of public record

in February, 1995, some two months before oral arguments. I sat with the Court during oral arguments in the presence of Appellant and his attorney. I wrote a dissenting opinion adverse to the position of the Appellant several weeks before Appellee's petition for rehearing was heard. During all of these months, Appellant knew of my participation and had the opportunity to determine the identity of my law firm and the nature of my practice. Appellant did not, however, file his motion for my disqualification until after the Court ruled against him.

Appellant has now made serious allegations regarding my participation, about which I will only make a few comments. Appellant's allegation that my law firm is qualified to act as bond counsel is true but irrelevant. We are qualified to practice in many areas of the law and municipal finance is not a significant part of our firm's overall practice. We have never been involved in any general obligation bond issue or any other bond issue which would or could be affected by the ruling in this case. Were it otherwise, I would never have accepted this assignment. The fact that, because of our legal abilities, a local governmental entity could be a "potential" client is not a reasonable basis for my disqualification in this case. Indeed, my firm's bond practice has not precluded it from representing taxpayers in illegal exaction cases detrimental to the interests of governmental entities. Finally, Appellant seeks my disqualification because three years ago my law firm worked with one of the many law firms that has filed an *amicus curiae* brief. This firm's co-representation of one client, in 1992, in a matter wholly unrelated to the case at bar, is not legally or ethically suggestive of or a basis for recusal.

Not only does Appellant's motion fail to set forth a reasonable basis for disqualification, it is untimely. Rule 6.4 of the Arkansas Supreme Court Rules requires that any motion requesting disqualification of a Justice "shall be filed a reasonable time prior to the submission of the case to the court." The rule is based upon the common sense principle that a party should not be allowed to wait upon the adverse outcome of a case to decide whether to seek disqualification of a judge. *See Nowlen* v. *Kreis*, 213 Ark. 1027, 214 S.W.2d 221 (1948); *Ingram* v. *Raiford*, 174 Ark. 1127, 298 S.W. 507 (1927). The motion should also be denied as a matter of judicial administration.

When considering a motion for disqualification, a judge has a duty *not* to recuse when no reasonable basis for disqualification exists. *See Walker* v. *Bishop*, 408 F.2d 1378 (8th Cir. 1969). Having fully considered every argument advanced by Appellant, I do not find it necessary or proper to recuse and I would deny the Appellant's motion for disqualification.