Steve CLARK, Attorney General, State of Arkansas, et al.
*v.* UNION PACIFIC RAILROAD COMPANY, et al.

87-205                                          745 S.W.2d 600

Supreme Court of Arkansas
Opinion delivered February 29, 1988
[Substituted Opinion on Denial of Rehearing
April 18, 1988*]

*Glaze, J., concurs; Hickman, J., would grant rehearing.

*Steve Clark*, Att'y Gen., by: *Jerome T. Kearney*, Asst. Att'y Gen. and *Frank J. Wills III*, Asst. Att'y Gen., for appellant.

*Herschel H. Friday* and *George Pike, Jr.*, by: *George Pike, Jr.*, for appellee.

JOHN I. PURTLE, Justice. This is a case concerning Amendment 59 to the Arkansas Constitution. This amendment was referred to the people by the legislature to counter the effect of our decision in *Arkansas Public Service Commission* v. *Pulaski County Board of Equalization*, 266 Ark. 64, 582 S.W.2d 942 (1979). The question in this case is whether a new millage passed after Amendment 59 was implemented can be collected against personal property. The answer is no.

Wynne School District #9 voted an increase of three mills in 1985. The collector of Cross County, upon the advice of the attorney general, applied the increase equally to both real and personal property. (The attorney general had changed his opinion which first said the new millage could not be collected against personal property.) The appellees filed suit to prevent collection of the millage against personal property. The chancellor held the new millage could not be collected against personal property until the rates equalize. The chancellor was correct. Amendment 59 provides that the amount of revenue derived from personal property cannot be increased until the rates for real and personal property equalize. It is undisputed that application of the new millage to personal property would increase the revenue collected.

The decision in *Public Service Commission* v. *Pulaski County Board of Equalization* was based on the Arkansas Constitution, Art. 16, § 5 as it read before the adoption of Amendment 59. The former § 5 read in pertinent part:

> § 5 All property subject to taxation shall be taxed according to its value, that value to be ascertained in such manner as the General Assembly shall direct, making the same equal and uniform throughout the State. No one species of property from which a tax may be collected shall be taxed

higher than another species of property of equal value
. . . .

■ Amendment 59 substituted a new section 5 and added sections 14, 15 and 16 to Const., Art. 16. The amendment provides in part:

> § 5(a) All real and tangible personal property subject to taxation shall be taxed according to its value, that value to be ascertained in such manner as the General Assembly shall direct, making the same equal and uniform throughout the State. No one species of property for which a tax may be collected shall be taxed higher than another species of property of equal value, except as provided and authorized in Section 15 of this Article, and except as authorized in Section 14 of this Article.
>
> . . .
>
> § 14(a) Whenever a county wide reappraisal or reassessment of property subject to ad valorem taxes made in accordance with procedures established by the General Assembly shall result in an increase in the aggregate value of taxable real and personal property in any taxing unit in this state of ten percent (10%) or more over the previous year the rate of city or town, county, school district, and community college district taxes levied against the taxable real and personal property of such taxing unit shall, upon completion of such reappraisal or reassessment, be adjusted or rolled back, by the governing body of the taxing unit, for the year for which levied as provided below. . . . The adjustment or rollback of tax rates or millage for the "base year" as hereinafter defined shall be designed to assure that each taxing unit will receive an amount of tax revenue from each tax source no greater than ten percent (10%) above the revenues received during the previous year from each such tax source, adjusted for any lawful tax or millage rate increase or reduction imposed in the manner provided by law . . . and after making the following additional adjustments:
>
> > (i) By excluding from such calculation the assessed value of, and taxes derived from, tangible personal property assessed in the taxing unit, . . .

(ii) By computing the adjusted or roll-back millage rates on the basis of the reassessed taxable real property for the base year that will produce an amount of revenue no greater than ten percent (10%) above the revenues produced from the assessed value of real property . . . from millage rates in effect in the taxing unit during the base year in which the millage adjustment or rollback is to be calculated.

Provided, however, that the amount of revenues to be derived from taxable personal property assessed in the taxing unit for the base year . . . shall be computed at the millage necessary to produce the same dollar amount of revenues derived during the current year in which the base year adjustment or rollback of millage is computed, and the millage necessary to produce the amount of revenues received from personal property taxes received by the taxing unit . . . shall be reduced annually as the assessed value of taxable personal property increases until the amount of revenues from personal property taxes . . . will produce an amount of revenues from taxable personal property equal to or greater than received during the base year, and *thereafter the millage rate for computing personal property taxes shall be the millage rates levied for the current year.* [Emphasis added.]

The amendment provides that the General Assembly shall establish by law the manner in which the equalization of assessment and millage is to be accomplished. In an attempt to clarify the matter, the General Assembly enacted Act 848 of 1981 (Ark. Code Ann. §§ 26-26-401 et seq. (1987)) which provides at § 405:

(a) Revenues derived from personal property by each taxing unit in the county are to be frozen at the base-year levels. The millage applied to personal property only is then adjusted downwards in the same proportion that the assessment base increases. The current millage is defined as the millage that was used in each taxing unit to derive the base year revenues for personal property. This procedure shall be followed each year until the personal property millage rate is equal to, or lesser than, the millage rate

applied to real estate, at which time the interim adjustment is complete, and both personal property and real estate shall thereafter be taxed at the same millage rate.

From the words used in Act 848 it is clear that the millage applied only to personal property will be adjusted downwards in the same proportion that the assessment base for all property increases. The concluding sentence clearly requires that this procedure be repeated annually until the interim adjustment is complete, at which time "both personal property and real estate shall thereafter be taxed at the same millage rate."

■ We glean from the language of Amendment 59 that the revenues produced from real estate taxes cannot be increased more than ten percent (10%) in the "base year" (the year following completion of reappraisal or reassessment). However, the adjustment or rollback in the "base year" is to be "adjusted for any lawful tax or millage rate increase or reduction imposed in the manner provided by law . . .." Therefore, in the absence of a lawful increase in the millage rate (which would apply only to real estate until the rates are equalized), the personal property rate reduction will depend upon the increase in revenues from real property, after making the specified adjustments.

■ Although Amendment 59 is obtuse, it can be seen that the overall intent was to equalize the assessments and millage rates with respect to personal and real property taxes after completion of reappraisal. In order to equalize the rate of taxation, it obviously is necessary to (1) lower the assessed valuation of personal property, (2) increase the assessed valuation of the real estate, or (3) hold the personal property rates at the present level, with adjustments, until the real estate tax rates reach the same level. Adding new millage at the same rate to personal property and real property would never equalize the two, and the goal of Amendment 59 could never be reached.

Act 848 and Amendment 59 require the eventual equalization of personal and real estate property tax rates. Therefore, the only practical way of obtaining equality between the two is to apply new millage rates only to realty until such time as the rates between the two classifications are equalized.

■ The only issue presented to this court is whether

Amendment 59 requires that personal property be exempted from new levies until such time as the rates are equalized. We hold that personal property is exempt from the new millage under these circumstances.

We do not decide the wisdom nor the constitutionality of Amendment 59. Our duty is to interpret the amendment and law as best we can and to enforce it. Therefore we affirm the decision of the chancellor.

Affirmed.

GLAZE, J., concurs.

HICKMAN, J., dissents.

TOM GLAZE, Justice, concurring. I agree with the result reached by the majority and have no doubts that, if this court were to hold otherwise, the voters' intent, in approving Amendment 59, to equalize assessments and millage rates with respect to personal and real property taxes could never be achieved. To accept appellants' argument that personal property should be subject to ad valorem taxes before this equalization process is achieved runs counter not only to the spirit and intent of Amendment 59, but also is in direct conflict with the Amendment's wording. For example, Amendment 59 provides:

> Provided, however, that *the amount of revenues to be derived from taxable personal property assessed in the taxing unit for the base year,* other than personal property taxes to be paid by public utilities and regulated carriers in the manner provided hereinabove, *shall be computed at the millage necessary to produce the same dollar amount of revenues derived during the current year in which the base year adjustment or rollback of millage is computed,* and the millage necessary to produce the amount of revenues received from personal property taxes received by the taxing unit, for the base year shall be reduced annually as the assessed value of taxable personal property increases until the amount of revenues from personal property taxes, computed on the basis of the current year millage rates will produce an amount of revenues from taxable personal property equal to or greater than received during the base year, and thereafter the millage rates for computing

personal property taxes shall be the millage rates levied for the current year. (Emphasis added.)

In view of the foregoing language, I will briefly review the undisputed and relevant facts here which reflect how the provisions of Amendment 59 have been applied in School District No. 9 of Cross County since that Amendment went into effect. It is undisputed that, in the base year of 1982, the amendment of revenues derived from taxable personal property assessed in School District No. 9 in Cross County resulted in the collection of $323,200. In 1982, the millage rate on personal property was 49, or 32.5 more millage than that imposed on real property in the district. To produce the Amendment's required same dollar amount of revenues collected from personal property taxes in 1982, the personal property millage rate in the district was adjusted downward to 45.4 mills. This adjustment narrowed the rate between personal and real property in the district to 28.9 mills. Specifically, the Cross County Assessor in 1983 collected $322,718 compared to the $323,200 received in the 1982 base year — which reflects the assessor's efforts (as required under Amendment 59) to keep the current year (1983) revenues close to the same dollar amount collected in the base-year 1982.

In 1984, the collections resulting from the personal property millage was $324,604, which again was close to the same dollar amount the county collected from the district in base-year 1982. At the same time, the $324,604 amount was based on a lower millage rate which was adjusted down to 40.9. This lower rate and approximate same dollar amount was obviously due to an increase in the value .of and the assessments on the personal property in the school district. This lower millage rate in 1984 further narrowed the gap between real and personal property rates to 24.4 mills.

The equalization process, which was being achieved in the school district, was impeded in 1985 because the voters in the district approved an additional three mill tax, which the county assessor imposed against both real and personal property in the school district. In doing so, the collections from personal property assessments rose to $351,531, or $28,000 more than the amount collected in base-year 1982. Obviously, the assessor's decision to apply the new three mill rate against personal property in the

district directly contravened the clear wording of Amendment 59, as I set out above. In addition, the decision to apply the new millage against both real and personal property slowed the process, which had been effected in the school district, of equalizing the rates between real and personal property.

Amendment 59 clearly imposes the duty to remove the illegal discrimination that exists between owners of real property and personal property. To impose new millages on both real and personal property unquestionably slows the process of equalizing the rates between the two. And, in counties where personal property assessments have actually gone down, equalization between the two types of property would never be achieved by adding new millages to both. For these reasons and those noted in the majority opinion, I believe the trial court's decision should be affirmed.

DARRELL HICKMAN, Justice, dissenting. Amendment 59 is the "Godzilla" of constitutional amendments. Nobody knows what it means. It was the child of fear and greed, spawned after our decision in 1979 which held that the Arkansas Constitution required that all property be assessed at market value. *Arkansas Public Service Comm.* v. *Pulaski County Board of Equalization*, 266 Ark. 64, 582 S.W.2d 942 (1979). Since it was a widespread practice that property, especially real property, had not been assessed at market value, our decision meant that the taxes of many property owners would double, triple, or more. This was the fear, especially of residential property owners, that spawned the amendment. So Amendment 59 to the constitution was proposed in the legislature. Marvin Russell, the director of the Assessment Coordinating Division of the Public Service Commission, explained what happened in the legislature:

> Mr. Russell: Judge, when we drafted Amendment 59, the purpose was to prevent high taxation to everybody, homeowners and everybody else. It established a roll back. Now, in that same amendment, to get support of Farm Bureau and AFA, they slipped in their section for preferential treatment —
>
> The Court: (Interposing) 14.
>
> Mr. Russell: (Continuing) — for preferential treatment,

and then everybody got in. They raised this Million Dollars, and they passed it, you know. Everybody voted for it. They got preferential treatment on assessment, but the rates are applied equally to their assessment or to your house assessment or to your personal automobile assessment.

The Court: I can understand. The rates should be applied equally, but the assessment is not equal. Is that correct?

Mr. Russell: No, sir, the assessments—they have preferential treatment in that they have use value based on productivity of the soils for those type lands, and the rate is in the roll back. When we rolled back the rate, what we would have done is reduced everybody's personal property by two-thirds. We would have retained about a third of it, it would have cost the schools a bundle of money. And, this became a political problem in the Legislature, and it was kicked around there until the final day for getting the Amendment on the ballot for it to be legal for that year. And, Governor Clinton came down with this idea of freezing personal property, and we told him then that it would be troublesome, that it would be a mad house to handle. He said, 'can you do it?' and we said, 'we probably can do it, but it's not a good idea.' He said, 'we've got to get it out.' So, they adopted that freeze on personal property at that point in time, and that was done without any impact study or any research, and that was the real flaw with Amendment 59. We are having to live with that thing, and the procedure was spelled out that you would adjust personal property—now, these people won't pay any more tax right now. They've been paying high. So, they'll just continue to pay high, and they'll be reduced each year. You'll pay less each year as the rate drops.

This was the greed that surfaced and resulted in powerful special interests being granted preferential treatment. They were the utility companies, the regulated carriers, the large landowners, especially the farmers, and the commercial and timber interests. The appellee railroad company is one of those interests, a regulated carrier.

Ironically, in the forefront promoting Amendment 59 were

the local school officials; the schools were the first to suffer from Amendment 59.

A special study commission of the legislature was created in 1985 to study the impact of Amendment 59. Its report was filed in September of 1986. "Special Study Commission on Amendment 59," Final Report, September 1986. Most of the evidence heard by the commission consisted of testimony by school officials regarding how much money Amendment 59 has and will cost Arkansas' primary and secondary public schools. For example, Dr. Ed Kelly, at one time superintendent of the Little Rock public schools, said the amendment would cost the Little Rock schools 14 million dollars over the next ten years. The superintendent of the Fayetteville public schools said it would cost Fayetteville schools over 26 million dollars; Greenland school district, a half million dollars, and so on.

So much for the background of Amendment 59. This is the first case regarding the interpretation of Amendment 59.

Actually, not a handful of people in Arkansas pretend to understand Amendment 59, and even those who do disagree on what it means. An extended discussion occurred as to how new millage voted would be applied. Mr. Russell said new millage should be applied to personal property. He explained what had occurred in this case:

> The Court: Now, where are we in Cross County then? What are they complaining about?
>
> Mr. Russell: They have passed—they have built a new school building over there. They wanted three mills. They voted three mills.
>
> The Court: The people did.
>
> Mr. Russell: Yes.
>
> The Court: To build a new school.
>
> Mr. Russell: To build a new school building. And, we believe that it should be charged against personal and real estate because in the freeze on personal property, we'd have to separate it—we do this every year. We have to audit, and you have to separate each levy within the total.

Say you had thirty mills of personal property, ten mills of that is charged for a debt service, a particular issue.

The Court: Bonds or whatever.

Mr. Russell: Right. A particular issue. Then say ten mills of it may be for maintenance and operation, paying teachers' salaries. And, another ten mills may be for another particular debt service, another particular issue, and each of those are obligated to that issue at the revenue level that we're frozen at in the base year.

The Court: All right.

Mr. Russell: Say it was Ten Thousand, Ten Thousand, and Ten Thousand. Well, we can't give them less than that.

The Court: It's already obligated.

Mr. Russell: It's obligated. Now, if we start—if we add three mills, there's nothing to cover it over here. When you finish out your equalization, the obligation is tied to those millage levies that are in place in the base year. So, any new levy for a new purpose would never be serviced. When you get down to your official rate, there's no place for those three mills to add on. You can't take away from those that are obligated. So, it's infinitely—or into infinity, it is never paid on that levy unless you charge it as a new levy for a new purpose. Another example that you would be aware of is—say, there is three allowed levies for school millage. There's maintenance and operation; there's capital outlay; and, then there's debt service. Each of those are three separate entities. All right, suppose they only had maintenance and operation, and their fifty mills was all for M and O, going for school teachers' salaries, and their building burned, and they have to vote a new millage for a new building. This fifty mills and the Thirty Thousand Dollars or whatever is committed to maintenance and operation and frozen at that. All right, we've got to build a new building. Where are you going to fund the personal property from? You've got to allow it to be charged against the personal property; otherwise, it will never fund its portion of that debt service. It can never have a place to enter into—you'd never have debt service millage against

personal property or capital outlay. Or if you want to go to cities and counties, the same precedent would apply there if you do away with the road tax. If they don't have a road tax, for example, and the Quorum Court comes along two years later and says, 'Okay, we've decided we want a road tax,' and they appropriate three mills. It'd have to go against personal and real; otherwise, it would never fund. The people paying personal property tax would never pay their share of the tax burden. The balance of the millages are obligated—

The Court: (Interposing) Already obligated.

Mr. Russell: Already obligated, yes, sir. The funds there, the revenues created are obligated one hundred percent, and there's no way we can borrow from them or intermingle them in any form. But, they will equalize in time.

At one point the trial judge observed:

Well, could you both be correct, and the people who drafted this thing didn't know what the hell they were doing, or didn't think down the road of what would happen?

It is clear that in some counties the tax rates may never equalize, which would then mean taxes on personal property would never increase.

Amendment 59 does not say that new millage voted cannot be applied to personal property, and I would not interpret it that way. Union Pacific Railroad Company, one of the appellees, received preferred treatment in Amendment 59 and now seeks to avoid paying personal property taxes to fund this three mill increase. Union Pacific reminds us they are in the same category as owners of pickup trucks in Cross County. I wouldn't want to overlook that consideration. I doubt that the pickup truck owner in Cross County would mind the dollar or so he would pay to the local school district if the Union Pacific Railroad Company would pay the hundreds or perhaps thousands it owes.

I would reverse the judgment.

Supplemental Concurring Opinion on Denial of Rehearing
April 18, 1988

Tom Glaze, Justice, concurring. I originally concurred in the result reached in this matter. The majority now deletes certain language (I consider dictum) from the original opinion and adds other language in its place. Part of the deleted wording indicated real estate taxes could not be increased more than ten percent after base-year 1982. To the extent the majority corrects its opinion by deleting such dictum, I agree.