Sharon PRIEST, Secretary of State, and Jimmie Lou Fisher,
Treasurer; Marilyn M. Zornik, Natural Guardian and Next
Friend of Anna Margaret Zornik, a Minor *v.* Jennifer POLK
and Randall L. Bynum, On Behalf of Themselves and
All Others Similarly Situated; Steve Clark

95-1197 912 S.W.2d 902

Supreme Court of Arkansas
Opinion delivered December 7, 1995

676

*Winston Bryant*, Att'y Gen., by: *Tim Humphries*, Deputy Att'y Gen., for appellants/cross-appellees, and *Ann Purvis*, Gen. Counsel, Sec. of State's Office, for separate appellant Sharon Priest, Sec. of State.

*Trotter Law Firm, P.A.*, by: *Scott C. Trotter, Richard B. Adkisson*, and *Larry Page*, for appellees/cross-appellants.

*DeLay Law Firm*, by: *R. Gunner DeLay*, for appellees.

*Vincent C. Henderson II*, amicus curiae.

DONALD L. CORBIN, Justice. Appellants, Secretary of State Sharon Priest and State Treasurer Jimmie Lou Fisher, appeal the order of the Pulaski County Chancery Court declaring void Acts 1 and 2 of the First Extraordinary Session of 1995, and enjoining the December 12, 1995 special election called by Governor Jim Guy Tucker pursuant to the Acts. Appellees, Jennifer Polk and Randall L. Bynum, and Intervenor Steve Clark, as citizens, residents, taxpayers, and qualified voters of this state, have cross-appealed. Jurisdiction of this appeal is properly in this court as

the constitutionality of legislative acts is challenged. Ark. Sup. Ct. R. 1-2(a)(3).

## PROCEDURAL HISTORY

Act 1 of the First Extraordinary Session of 1995 established procedures for calling a constitutional convention subject to ratification by the people of the State of Arkansas, for drafting a new constitution, and for submitting a proposed new constitution to the voters. Act 2 of the First Extraordinary Session of 1995 appropriated $1,100,000.00 from the State Central Services Fund to finance the convention and pay expenses of delegates. Both acts contained emergency clauses stating they would be effective from the date of passage and approval. The acts were approved by the Governor on October 19, 1995.

Pursuant to Act 1, the Governor issued a proclamation providing a filing period from October 23, 1995, through November 2, 1995, for persons desiring to be elected delegates to the convention. The Governor's proclamation also set December 12, 1995, as the date for the statewide special election for ratification of the call of the convention and election of thirty-five convention delegates from existing state Senate districts. Also pursuant to Act 1, the President Pro Tempore of the Arkansas Senate and the Speaker of the Arkansas House of Representatives nominated ten senators and sixteen representatives as delegates to the convention. According to the proposed ballot form in Section 4 of Act 1, the names of these twenty-six appointed delegates would appear on the ballot form for the voters to approve as a block of delegates along with the call of the convention.

Appellees filed a complaint in chancery court on October 24, 1995, seeking a declaration that Acts 1 and 2 were encroachments on the rights of the people in a manner prohibited by Article 2, §§ 1 and 29 of the Arkansas Constitution of 1874 ("the Arkansas Constitution"), challenging the emergency clauses of Acts 1 and 2, and challenging the ballot form proposed in section 4. The complaint alleged that, due to the foregoing violations, any public funds expended on the election or convention would result in an illegal exaction pursuant to Article 16, § 13 of the Arkansas Constitution. The complaint also sought injunctions to restrain appellant Priest from certifying the ballot title or the name of any delegate on the December 12, 1995 special election

ballot, to restrain appellant Priest from certifying the results of the December 12, 1995 special election if it is held, and to restrain the expenditure of public funds for the special election on December 12, 1995, for the convention, and for the publication of any document proposed by the convention.

On November 13, 1995, the chancellor granted the motion to intervene of Intervenor Clark. Intervenor Clark's motion sought intervention as a taxpayer and voter for the purpose of addressing an additional argument with respect to the constitutionality of the challenged legislation. Specifically, Intervenor Clark contends Act 1's procedure for selecting the twenty-six appointed delegates to the proposed convention violates the one-person, one-vote principle.

On November 16, 1995, the chancellor granted the motion to intervene of Intervenor Marilyn M. Zornik, as natural guardian and next friend of Anna Margaret Zornik, a minor. Anna Margaret Zornik is diagnosed with Down's syndrome and receives health care services under this state's federally-funded Medicaid program. Intervenor Zornik sought intervention for the purpose of developing the record as regards the effect of the chancellor's order upon her ability to protect her daughter's entitlement to continued Medicaid services, in light of the recent judicial invalidation of Amendment 68 to the Arkansas Constitution on supremacy clause grounds. *Little Rock Family Planning Servs., P.A.* v. *Dalton*, 860 F. Supp. 609 (E.D. Ark. 1994), *aff'd*, 60 F.3d 497 (8th Cir. 1995). Specifically, Intervenor Zornik contends the December 12 election should proceed.

On November 13, 1995, appellant Priest certified the ballot for the special election of December 12, 1995.

The parties and chancellor agreed to an expedited proceeding in the chancery court. They submitted the case to the chancellor on stipulated facts. The parties also stipulated that subject-matter jurisdiction existed in the chancery court. The chancellor held a hearing on November 14, 1995, and, in a ruling from the bench, found merit only in appellees' allegation that the emergency clause was invalid for failure to state facts constituting an emergency. The chancellor found that, due to time limitations expressed in Act 1, the invalid emergency clause rendered the entire act void. The chancellor therefore determined

an illegal exaction would result if funds were expended for the election on December 12, 1995, and enjoined the election by written order entered on November 17, 1995. This appeal and cross-appeal are from that order.

We granted the parties' motions to expedite this appeal, and we allowed Vincent C. Henderson, II, a candidate for delegate to the proposed convention, to file a brief as *amicus curiae* in support of appellants. By per curiam order filed on November 28, 1995, we granted appellants' motion to stay enforcement of the chancellor's order pending this appeal.

## SUBJECT-MATTER JURISDICTION

The parties stipulated that chancery court had subject-matter jurisdiction of this case pursuant to Article 7 of the Arkansas Constitution and Ark. Code Ann. § 16-13-304 (Repl. 1994). It is well-settled that subject-matter jurisdiction cannot be waived and cannot be invoked by consent of the parties. *Arkansas Dep't of Human Servs.* v. *Estate of Hogan,* 314 Ark. 19, 858 S.W.2d 105 (1993). A court has a duty to determine if it has subject-matter jurisdiction of the case before it. *Skelton* v. *City of Atkins,* 317 Ark. 28, 875 S.W.2d 504 (1994). When the trial court lacked subject-matter jurisdiction, the appellate court also lacks jurisdiction. *First Pyramid Life Ins. Co.* v. *Reed,* 247 Ark. 1003, 449 S.W.2d 178 (1970). Accordingly, the question of subject-matter jurisdiction is one that this court is obligated to raise on its own. *Id.*

Our review of the case law on this issue leads us to conclude that the question of subject-matter jurisdiction is determined by the characterization of the case. When a case is characterized as one involving political rights, this court has held that jurisdiction lies exclusively in circuit court. *Catlett* v. *Republican Party of Arkansas,* 242 Ark. 283, 413 S.W.2d 651 (1967); *see Walls* v. *Brundidge,* 109 Ark. 250, 160 S.W. 230 (1913) (quoting *In re Sawyer,* 124 U.S. 200 on the distinction between political rights, defined as those which involve the power to participate directly and indirectly in the establishment or management of government, and civil rights, defined as those which consist in the power to acquire and enjoy property). However, when a case is characterized as an illegal-exaction case, we have held that jurisdiction lies concurrently in chancery and circuit courts because the constitution does not assign jurisdiction of illegal-exaction

cases. *Foster* v. *Jefferson County Quorum Court*, 321 Ark. 105, 901 S.W.2d 809, *supp. op. granting reh'g on other grounds*, 321 Ark. 116-A, 901 S.W.2d 809 (1995). While the concurrence characterizes this case as one involving political rights solely cognizable in circuit court, such a view overlooks other allegations in the complaint, such as the challenge to the emergency clause and the challenge to the ballot title or ballot form. We have addressed challenges to emergency clauses, ballot titles, and ballot forms that were brought in chancery court. *McCuen* v. *Harris*, 321 Ark. 458, 902 S.W.2d 793 (1995) (addressing ballot-title challenge); *Burroughs* v. *Ingram*, 319 Ark. 530, 893 S.W.2d 319 (1995) (addressing emergency-clause challenge); *Riviere* v. *Wells*, 270 Ark. 206, 604 S.W.2d 560 (1980) (addressing challenge to ballot form for submission of proposed constitution of 1980).

██ It is well-settled that when a court of equity acquires jurisdiction for one purpose, it retains jurisdiction for all purposes, provided the original object of the suit is clearly within equity's jurisdiction and there is no adequate remedy at law. *Dugan* v. *Cureton*, 1 Ark. 31 (1837). This is an expression of equity's "clean-up" doctrine. However, this court has held that when a suit includes a request for an injunction to prevent an illegal exaction, the adequacy of the legal remedy is immaterial because Article 16, § 13 of the Arkansas Constitution itself confers the right to an injunction with respect to an illegal exaction. *Townes* v. *McCollum*, 221 Ark. 920, 256 S.W.2d 716 (1953). On that basis, this court held in *Townes* that equity jurisdiction existed to enjoin officers of the executive branch from expending public funds to hold an unauthorized election. *Id.*

*Catlett* was a suit to enjoin an election, but did not allege an illegal exaction. Moreover, *Catlett* only involved rights pertaining to political parties and their compliance with allegedly unconstitutional election laws and did not include any other type of issue, such as an emergency-clause or ballot-title issue. Similar to *Catlett*, *Townes* was a suit to enjoin an election. However, unlike *Catlett*, *Townes* also involved a claim that the election would result in an illegal exaction. Thus, the present case is factually more similar to *Townes* than *Catlett*.

██ The present case has multiple aspects and therefore cannot be characterized solely as an election-contest case or one

involving only political rights. It is also an illegal-exaction case, an emergency-clause case, and a ballot-title case, each of which could properly be brought in chancery court. Therefore, we conclude, chancery court had subject-matter jurisdiction of this case.

## DIRECT APPEAL

### EMERGENCY CLAUSE — AMENDMENT 7

Appellants contend the chancellor erred in holding the emergency clauses in Acts 1 and 2 were invalid. The emergency clause of Act 1 states in its entirety:

> SECTION 18. EMERGENCY. It is hereby found and determined by the General Assembly that there is an immediate and urgent need for constitutional revision in Arkansas. Since many parts of the Constitution of Arkansas are archaic, obsolete, and unrelated to the needs and demands of the citizens for good government in both the state and local governments; and since the number and types of changes needed are not suitable for piecemeal amendment of the present Constitution; an emergency is hereby declared to exist, and this Act is declared to be necessary for the immediate preservation of the public peace, health and safety and shall be in full force and effect from and after its passage and approval.

An emergency clause has a significant effect on the people's reserved right of referendum and is therefore expressly controlled by Amendment 7 to the Arkansas Constitution. *Burroughs*, 319 Ark. 530, 893 S.W.2d 319. Amendment 7 establishes the right of referendum by stating that the legislative power of the people is vested in the General Assembly, but the people reserve the power "to approve or reject at the polls any entire act or any item of an appropriation bill." Ark. Const. amend. 7. By operation of Amendment 7, the people have until ninety days after adjournment of the legislative session to file a referendum petition. Any measure referred to the people by referendum petition remains in abeyance until voted upon. *Id.* The General Assembly is authorized to make an act effective immediately "[i]f it shall be necessary for the preservation of the public peace, health and safety" by enacting an emergency clause. *Id.* However, it is necessary that the General Assembly "state the fact which con-

stitutes such emergency." *Id.* These requirements of Amendment 7 were observed by this court in *Cunningham* v. *Walker*, 198 Ark. 928, 132 S.W.2d 24 (1939).

■■ Most recently we have held that:

> [I]t is a matter of legislative determination whether an emergency exists that requires the enactment of an emergency clause, but pursuant to Amendment 7, it is a judicial determination whether facts constituting an emergency are stated. . . . [A]n emergency clause which does not state a fact that constitutes an emergency is invalid. . . . [T]here must be some statement of fact to show that a "real emergency existed."

*Burroughs*, 319 Ark. 530, 533, 893 S.W.2d 319, 320-21 (quoting *Gentry* v. *Harrison*, 194 Ark. 916, 110 S.W.2d 497 (1937) (citations omitted)). The test for determining if a real emergency has been stated is whether reasonable minds might disagree as to whether the enunciated facts state an emergency. *Id.* If so, the emergency clause is upheld; if not, then the emergency clause is invalid. *Id.* Emergency is defined as "some sudden or unexpected happening that creates a need for action." *Id.* at 535, 893 S.W.2d at 321.

The chancellor applied the aforementioned test and concluded the emergency clause in Act 1 did not state facts demonstrating a real emergency and therefore was invalid. The chancellor ruled further that the emergency clause could not be severed from Act 1 while still giving full effect to its other provisions and therefore declared Act 1 void. The chancellor ruled that she need not reach the emergency clause in Act 2 because Act 2 must "suffer the same fate and is thus void."

Appellants contend the emergency clause of Act 1 enunciates two statements of fact. First, appellants rely on the statement that "many parts of the Constitution of Arkansas are archaic, obsolete, and unrelated to the needs and demands of the citizens for good government in both the state and local governments." Second, appellants rely on the statement that "there is an immediate and urgent need for constitutional revision in Arkansas. . . . since the number and types of changes needed are not suitable for piecemeal amendment of the present Constitution." The chan-

cellor concluded these two statements did not state an emergency because they did not describe a sudden or unexpected happening creating a need for action.

The emergency clause at issue in this case is very similar to the one upheld in *Mann* v. *Lowry,* 227 Ark. 1132, 303 S.W.2d 889 (1957), where the General Assembly passed an act to establish a new form of city government for all cities of the first and second class. The emergency clause at issue in *Burroughs,* relied upon by the chancellor, stated that a new procedure was needed for calling special meetings of the West Memphis City Council and was held invalid. Our decision today is a catalyst to understanding and reconciling the *Burroughs* and *Mann* cases, two cases that when read separately appear to be inconsistent, but are not upon further examination. The scope of the proposed governmental reform is what distinguishes those two cases, and aligns the instant case with *Mann* rather than with *Burroughs. Mann* and the instant case both call for an entirely new form of government, while *Burroughs* only called for a modification of the existing government proposed by outgoing members of the governing body for obvious political reasons.

█ Everyone may not agree that the need for a new constitution, as described in the emergency clause of Act 1, is a real emergency. However, that is not the test. The test is whether reasonable people might disagree as to whether an emergency is stated. *Burroughs,* 319 Ark. 530, 893 S.W.2d 319. In reviewing our recent case of *Burroughs,* we realize that it did not fully explore the methodology that this court has historically used to analyze emergency clauses, although it did apply the historical analysis in invalidating the emergency clause due to the obvious political motivation of the outgoing councilmen. In *Jumper* v. *McCollum,* 179 Ark. 837, 840, 18 S.W.2d 359, 361 (1929), this court stated that "[i]f the fact which constitutes the emergency is recited, and if fair-minded and intelligent men might reasonably differ as to the sufficiency *and truth* of the fact assigned for placing the act in effect immediately upon its passage, the courts are concluded by the finding." (Emphasis added.) Thus, it is evident that this court's more recent cases on emergency clauses have failed to mention that we examine them to determine whether reasonable minds might differ as to the truth of the factual data alleged by the legislative body. Therefore, the instant case pre-

sents us with an opportunity to reconcile *Burroughs, Mann*, and *Jumper* within the scope of the proposed reforms.

■ The fact that our current constitution is archaic and obsolete and cannot be updated without sweeping reform states an emergency. In so ruling, we observe that the General Assembly does not operate in a vacuum and that recent litigation in this court and federal courts has called wide-spread attention to at least four far-reaching problem areas in our state government caused by our existing constitution. *E.g., Tucker* v. *Lake View Sch. Dist. No. 25*, 323 Ark. 693, ___ S.W.2d ___ (1996) (public-school funding); *Little Rock Family Planning Servs., P.A.* v. *Dalton*, 860 F. Supp. 609 (E.D. Ark. 1994), *aff'd* 60 F.3d 497 (8th Cir. 1995) (Medicaid funding); *Foster* v. *Jefferson County Quorum Court*, 321 Ark. 105, 901 S.W.2d 809, *supp. op. granting reh'g on other grounds*, 321 Ark. 116-A, 901 S.W.2d 809 (1995) (county sales tax); *Brown* v. *City of Stuttgart*, 312 Ark. 97, 847 S.W.2d 710 (1993) (equipment purchases by local government). In addition, there is at least a fifth problem area in our state government caused by our constitution's provisions for challenging initiated and referred measures and proposed constitutional amendments that was illustrated by the rash of expedited litigation in this court prior to the November 1994 general election. *E.g., McCuen* v. *Harris*, 318 Ark. 522, 891 S.W.2d 350 (1994) (per curiam) (sales tax); *Wilson* v. *Cook*, 318 Ark. 520, 886 S.W.2d 593 (1994) (per curiam) (succession and vacancies in office); *Walker* v. *McCuen*, 318 Ark. 508, 886 S.W.2d 577 (1994) (soft-drink tax); *Page* v. *McCuen*, 318 Ark. 342, 884 S.W.2d 951 (1994) (casino gambling); *Bailey* v. *McCuen*, 318 Ark. 277, 884 S.W.2d 938 (1994) (worker's compensation); *Walmsley* v. *McCuen*, 318 Ark. 269, 885 S.W.2d 10 (1994) (charitable bingo and raffles); *Christian Civic Action Comm.* v. *McCuen*, 318 Ark. 241, 884 S.W.2d 605 (1994) (state lottery). With these reported cases in mind, and the statements of fact in Act 1's emergency clause, the legislature was clearly attempting to cure at least five deficiencies in our state government, while at the same time being expressly limited to referring only three constitutional amendments to the people. Ark. Const. art. 19, § 22. Therefore, we find truth to the statement in the emergency clause that piecemeal amendment to the constitution is not suitable.

■ Thus, we conclude, as this court concluded in *Mann*,

that reasonable people might disagree that the facts stated in Act 1's emergency clause concerning the need for a new constitution did state an emergency. The chancellor's ruling to the contrary is therefore reversed, as is her ancillary ruling enjoining the election as an illegal exaction.

 The *amicus curiae* raises an argument that Amendment 7 does not apply to this case at all because Act 1 was not an exercise of the legislative power; rather it was an exercise of the people's powers under Article 2, §§ 1 and 29 of the Arkansas Constitution. We do not consider this argument because the *amicus curiae* cannot enlarge the issues beyond those raised by the pleadings of the parties in the lower court. *City of Little Rock* v. *AT&T Communications of the Southwest, Inc.*, 316 Ark. 94, 870 S.W.2d 217 (1994); *Moorman* v. *Pulaski Co. Democratic Party*, 271 Ark. 908, 611 S.W.2d 519 (1981).

## CROSS-APPEAL

### THE PEOPLE'S INHERENT POWER TO ABOLISH AND REFORM GOVERNMENT PURSUANT TO ARTICLE 2, §§ 1 & 29 AND ARK. CODE ANN. §§ 7-9-301 TO -312 (REPL. 1993)

Appellees, as cross-appellants, challenge the chancellor's ruling that, excluding the emergency clause, Act 1 is not an unlawful encroachment on the peoples' rights in Article 2, §§ 1 and 29 of the Arkansas Constitution.

Article 2, sections 1 and 29 provide as follows:

1. Source of power.

All political power is inherent in the people and government is instituted for their protection, security and benefit; and they have the right to alter, reform or abolish the same in such manner as they may think proper.

29. Enumeration of rights of people not exclusive of other rights — Protection against encroachment.

This enumeration of rights shall not be construed to deny or disparage others retained by the people and to guard against any encroachments on the rights herein retained, or any transgression of any of the higher powers herein dele-

gated, we declare that everything in this article is excepted out of the general powers of the government, and shall forever remain inviolate; and that all laws contrary thereto, or to the other provisions herein contained, shall be void.

 Relying on these sections of the constitution, Article 19, § 22 of the Arkansas Constitution, Amendment 7 to the Arkansas Constitution, *Pryor* v. *Lowe*, 258 Ark. 188, 523 S.W.2d 199 (1975), and *Harvey* v. *Ridgeway*, 248 Ark. 35, 450 S.W.2d 281 (1970), appellees essentially contend that the power to rewrite the constitution can only be exercised by the people, not by the legislature. The holding of *Pryor* was very narrow and has not been expanded to the degree argued by appellees. The holding that the proposed limitations on the constitutional convention at issue in that case were encroachments on the people's rights in violation of Article 2, § 29, was expressly based on the lack of a provision for ratification by the people. *See Pryor*, 258 Ark. at 192, 523 S.W.2d at 202. In contrast, Act 1 does provide that both the call of the convention and the proposed document be ratified by the voters. Therefore *Pryor* does not control this case. Likewise, *Harvey* does not control this case. While *Harvey* does stand for the clear and correct proposition that it is the people's right to reform their constitution and the people have not given that right to any branch of government, *Harvey* does not prohibit the legislature from calling a convention and submitting the call to the people. The chancellor's ruling on this issue is affirmed.

 In addition, appellees claim Acts 1 and 2 conflict with sections 7-9-301 to -312, which establish a procedure for calling a constitutional convention, selecting delegates, filling delegate vacancies, conducting the convention, and submitting the proposed constitution to the voters. Intervenor Clark also raises an argument that the appointment of convention delegates by the Speaker and President Pro-Tempore invade the inherent right of the people as expressed in Article 2, §§ 1 and 29. The chancellor did not rule on these issues, thus leaving them unresolved below and therefore not preserved for appeal. *Brumley* v. *Naples*, 320 Ark. 310, 896 S.W.2d 860 (1995).

### BALLOT TITLE / BALLOT FORM

Appellees, as cross-appellants, contend that the ballot title or ballot form of Section 4 of Act 1 is misleading because it does

not include any of the terms of Act 1, such as the nomination of appointed delegates and the filing deadlines for elected delegates, among others. Appellees also contend the ballot form is misleading because it does not allow a voter to approve the calling of the convention, yet reject any or all of the twenty-six appointed delegates. The ballot form is stated in Section 4 of Act 1 and reads as follows:

> (1) "For calling a Constitutional Convention to propose a new Constitution for the State of Arkansas, as provided in Act _____ of the Acts of the First Extraordinary session of the Eightieth (80th) General Assembly of 1995, and subject to the terms of that Act, and electing the nominated Convention delegates listed below:"

> (Names of 26 nominated delegates from the General Assembly)

> (2) "Against calling a Constitutional Convention."

Relying on *Riviere*, 270 Ark. 206, 604 S.W.2d 560, the chancellor ruled that the people would be able to ratify the terms and restrictions of Act 1 at the December 12 special election even though the terms and restrictions are not expressly disclosed in the ballot form. The chancellor therefore concluded the ballot form was not misleading.

█ The form of the ballot proposed by a constitutional convention cannot be misleading. *Riviere*, 270 Ark. 206, 604 S.W.2d 560. Constitutional convention ballot forms must submit proposals "for approval or rejection" or "for adoption or rejection" as required by section 7-9-310, formerly Ark. Stat. Ann. § 2-112, *Harvey*, 248 Ark. 35, 450 S.W.2d 281, and *Pryor*, 258 Ark. 188, 523 S.W.2d 199. *Riviere*, 270 Ark. 206, 211, 604 S.W.2d 560, 562. *Riviere* holds that, when a vote is taken in the form of "For X" and "Against X," any limitations associated with a convention's proposal or any change from a general election to a special election is ratified in the vote. *Id.* Since the ballot form at issue here is in the for-against format, we cannot say the chancellor erred in interpreting *Riviere* and holding the ballot form at issue is not misleading.

█ As for appellees' argument that the form is misleading because it does not allow voters to vote for the calling of the

convention without also voting for all twenty-six appointed delegates, that issue was not ruled upon by the chancellor. It was appellees' burden, as cross-appellants, to obtain a ruling on that issue. *Brumley*, 320 Ark. 310, 896 S.W.2d 860. Their failure to obtain the ruling left the matter unresolved, which operates as a waiver of the issue for purposes of appeal. *Id.*

### *SUBMISSION OF CALL FOR CONVENTION TO PEOPLE BY LEGISLATURE*

 Appellees, as cross-appellants, argue that Amendment 7 prohibits the legislature from referring to the people the calling of the convention, as provided for in Section 4 of Act 1. Appellees are absolutely correct in contending that the General Assembly is prohibited from referring to the people any "measure" except constitutional amendments as provided for in Article 19, § 22 of the Arkansas Constitution and other exceptions provided for in the constitution that are not applicable here. However, the General Assembly is not referring Act 1 to the people, and, as the chancellor ruled, Section 4 of Act 1 is not a "measure" the submission of which is prohibited by Amendment 7. Act 1 prescribes procedures for a constitutional convention to be ratified by the people. We cannot say the chancellor erred in this regard.

### *ONE PERSON, ONE VOTE*

Intervenor Clark, as cross-appellant, challenges the chancellor's ruling that the one-person, one-vote principle does not apply to constitutional conventions. Intervenor Clark cites no source for the one-person, one-vote principle other than Article 2, §§ 1 and 29. The chancellor observed that other jurisdictions have concluded that the principle does not apply to constitutional conventions because such conventions do not make laws but merely propose new ones to voters for approval or rejection. The chancellor also observed that the case upon which Intervenor Clark relied heavily, *State of West Virginia* v. *Gore*, 143 S.E.2d 791 (1965), was a well-reasoned case. However, because this is an issue of first impression in this state, the chancellor chose to follow the lead of other jurisdictions. *See, e.g., Stander* v. *Kelley*, 250 A.2d 474, *cert. denied*, 395 U.S. 827 (1969).

 On appeal, Intervenor Clark again relies on *Gore*,

143 S.E.2d 791, and *Forty-Second Legislative Assembly* v. *Lennon,* 481 P.2d 330 (1971). Both cases are clearly distinguishable due to the differences in the West Virginia, Montana, and Arkansas Constitutions. West Virginia's Constitution has an express provision that "[e]very citizen shall be entitled to equal representation in the government, and, in all apportionments of representation, equality of numbers of those entitled thereto, shall as far as practicable, be preserved." W. Va. Const. art. 2, § 4. Montana's Constitution requires that the number of delegates to a constitutional convention be the same as its state house of representatives and be elected in the same manner as state representatives. Mont. Const. art. 19, § 8. There are no analogous or similar provisions in the Arkansas Constitution. We observe that the United States Supreme Court has not held that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution applies to state elections when the persons elected do not perform public functions. *See Hadley* v. *Junior College Dist.,* 397 U.S. 50, 56 (1970). This court held in *Riviere* that a constitutional convention is not a coordinate branch of government. *Riviere,* 270 Ark. 206, 604 S.W.2d 560. Therefore, we conclude the one-person, one-vote principle does not apply to constitutional conventions in this state. The chancellor's ruling is affirmed in this regard.

 The order is reversed on direct appeal because the chancellor erred in enjoining the special election. The order is affirmed on cross-appeal. The case is remanded to the chancery court for entry of an order consistent with this opinion.

Chief Justice Jesson and Associate Justice Brown join in this opinion to reverse and remand on direct appeal. Associate Justice Glaze concurs, joining the decision to reverse the case on direct appeal, but contending the case should be dismissed. Associate Justices Dudley, Newbern, and Roaf dissent, voting to affirm on direct appeal. Thus, while this is a plurality opinion declaring the law in this case, there is indeed a majority decision to reverse the chancellor's decision on direct appeal.

The mandate in this case shall issue immediately.

GLAZE, J., concurs.

DUDLEY, NEWBERN, and ROAF, JJ., dissent.

Tom Glaze, Justice, concurring. I concur. Because I am of the opinion the chancellor had no jurisdiction to decide this case below, I would reverse with directions to dismiss this cause. Accordingly, I would not reach the merits of the appellees' cross-appeal.

On July 17, 1995, less than four months ago, this court considered for the first time a subject matter jurisdiction question like the one before us now, and by a 4-3 vote, decided chancery court had jurisdiction to enjoin an election official — the Secretary of State — from canvassing election returns and counting votes from the November 8, 1994 General Election on proposed Amendment 2, which was referred to the vote of the people pursuant to Ark. Const. art. 19, § 22. The four-member majority's decision was wrong and should now be overturned. The dissenting opinions, citing this court's landmark case of *Catlett* v. *Republican Party of Arkansas*, 242 Ark. 283, 413 S.W.2d 651 (1967), pointed out that chancery court has no authority to decide election or political rights cases. In relevant part, the *Catlett* decision stated the following:

> Nor can it [chancery court] be invoked for the purpose of restraining the holding of an election, or of directing or controlling the mode in which, or of determining the rules in pursuance of which, an election shall be held. Those matters involve in themselves no property right but pertain solely to the political administration of government.

The *Catlett* court also stated courts of equity have *no authority or jurisdiction* to interpose for the protection of rights which are purely political, and where no civil or property right is involved.

Here, the relief sought and obtained by the plaintiffs in this case was (1) for Acts 1 and 2 of 1995 to be declared invalid and (2) for the December 12, 1995 special election to be enjoined. Although *Catlett* holds chancery courts have *no authority* to decide political rights issues or to restrain the holding of elections, that is the very relief granted by the chancellor in this case. In allowing and arguing the invalidity of Act 1, plaintiffs claim the Act unlawfully and unconstitutionally encroaches upon the people's bill of rights and the "*political power inherent in the people*" as set out in Ark. Const. art. 2, §§ 1 and 29.

This court's controlling opinion herein suggests that a lower court's jurisdiction is decided by however this court might characterize a given case. And plaintiffs argue that, under *Liles* v. *Liles*, 289 Ark. 159, 711 S.W.2d 442 (1986), if chancery court has jurisdiction for one purpose, it may decide all other issues. Plaintiffs specifically contend that, because chancery court has authority to decide illegal exaction and ballot title issues, the chancellor could further decide the political and election issues in the case as well. The plaintiff's contention is faulty.

First, even under the *Liles* decision, chancery court cannot obtain jurisdiction of a case where a court of equity is "wholly incompetent" to consider the matter. In *Catlett*, this court unequivocally held chancery court had *no authority* to decide political rights issues or requests to enjoin an election. In sum, the chancellor was wholly incompetent to grant the relief it did in this case.

Second, this court stated in *Foster* v. *Jefferson County Quorum Court*, 321 Ark. 105, 901 S.W.2d 809 (1995), both circuit and chancery courts may exercise subject matter jurisdiction in illegal exaction cases, but a chancery court has no such jurisdiction when the underlying matter is conferred on the circuit court. Here, the clear underlying matter concerns the validity of Act 1 and plaintiffs' contention that Act unlawfully encroaches upon the people's inherent political power — a right cognizable only in circuit court.

Third, circuit and chancery courts both can decide ballot title issues and are subject to the same underlying matter test discussed in the foregoing illegal exaction analysis. However, plaintiffs cite *Berry* v. *Hall*, 232 Ark. 648, 339 S.W.2d 433 (1960), and argue that decision requires that ballot title issues must be filed and decided in chancery court. That is not the holding in *Berry*. In *Berry*, this court merely held that it had only appellate, not original, jurisdiction in disputes arising under Ark. Const. art. 19, § 22. In dictum, the *Berry* decision mentioned, without citation of authority, that the parties there should have filed their case in chancery court, not the supreme court. To the contrary, no statutory or constitutional provision assigns chancery court authority to decide ballot title issues arising under art. 19, § 22. At most, chancery court can only share subject matter jurisdiction in such a case and then only when the underlying matter is

not one solely cognizable in circuit court, as is the situation in the present case.

In decisional conference, most of the justices on this court expressly acknowledged the confusing precedent bearing on the subject matter jurisdiction issue in this case. Because of the confusion that continues to arise in these political rights, election, illegal exaction, and ballot title cases, there is a great reluctance to dismiss anyone's case, giving subject matter jurisdiction as the reason. I sympathize with that view, but the fact remains, this court is the only one that can give clarity to its precedents, and it has a duty to do so. A bright line should be established so that the parties, attorneys and judges can know where the above-type cases must be filed in order to obtain a final decision without concern the decision will not later be set aside on jurisdictional grounds. As matters now stand, this court may or may not sustain jurisdiction if it chooses to "characterize" a lawsuit in a certain way.

To confuse matters further, this court has recently adopted another test previously unknown in its prior precedents, namely, unless chancery court has *no tenable nexus* whatever to the claim in question, this court will consider the matter of whether the claim should have been heard there to be one of *propriety* rather than one of subject matter jurisdiction. *See Liles*, 289 Ark. at 175 and 176; *UHS of Ark., Inc.* v. *Charter Hosp. of Little Rock, Inc.*, 297 Ark. 8, 759 S.W.2d 204 (1988). Apparently, if a case is characterized as one of *propriety*, this court will not raise the issue itself and will not permit a party to raise it on appeal. *Id.* The test ignores all case law, as I know it, that subject matter jurisdiction can be raised at any time, and in fact it is this court's duty to do so. *Arkansas State Employees Ins. Advisory Comm'n* v. *Estate of Manning*, 316 Ark. 143, 870 S.W.2d 748 (1994). Unfortunately, I have no idea what this "propriety" test means and the opinions in *Lile* and *UHS* cite no authority supporting or explaining it. My point in mentioning this new test used in determining where or if jurisdiction exists in chancery court is not to be critical, but instead to emphasize how confusing this subject matter jurisdiction determination has gotten.

If the plaintiffs here had filed their action in circuit court, no subject matter jurisdiction issue would exist since a circuit

court could have decided and granted all the relief sought by the plaintiffs. In sum, this court has an opportunity to establish in which court these constitutional matters should be filed in the future, but it refuses to offer any clarification or guidance. Future litigation in these constitutional matters (political rights, election, illegal exaction and ballot title cases) remains jurisdictionally in doubt.

For the above reasons, I would reverse and dismiss this cause.

ROBERT H. DUDLEY, Justice, dissenting. The legislative power of the people is vested in the General Assembly, but the people have the power of referendum, which is the power to reject at the polls any act or separate item of an appropriation bill. Ark. Const. amend. 7. To insure the right of referendum, the constitution provides that the people have ninety days after adjournment of a legislative session to file a referendum petition, and that a legislative act will not become effective during that period. *Id.*; *Fulkerson v. Refunding Bd. of Arkansas*, 201 Ark. 957, 147 S.W.2d 980 (1941). An act referred to the people remains in abeyance until approved by the people. Ark. Const. amend. 7. If, however, it is necessary for the "preservation of the public peace, health and safety that a measure shall become effective without delay, and *such necessity shall be stated*" in the act, the act becomes effective immediately and remains in effect until there is an adverse vote upon referral. Ark. Const. amend. 7 (emphasis added).

I.

Act 1 of the First Extraordinary Session of 1995 establishes procedures for calling a constitutional convention, for rewriting the current constitution, and for submitting the rewritten constitution to the people. It provides, among other things, that of the sixty-one delegates to the convention, thirty-five shall be elected by the people and twenty-six of the delegates will be nominated from among the members of the General Assembly, to be elected by popular vote as part of the decision of the people to call a convention. Act 2 of the same session appropriates $1,100,000 to finance the convention and pay the expenses of the delegates. Both acts were signed into law by the Governor on October 19, 1995. Under ordinary circumstances the people would have had

ninety days, or until January 17, 1996, to refer the acts. However, the General Assembly enacted emergency clauses as part of both acts. The Governor, under authority of Act 1, then issued a proclamation setting October 23, 1995, to November 2, 1995, as the filing period for election of delegates to the constitutional convention, and December 12, 1995, as the date for a statewide special election to select the thirty-five convention delegates and for ratification of the call of the convention.

The General Assembly, in enacting emergency clauses as part of both acts, defeated the people's right to reject at the polls the expenditure of $1,100,000 and to reject the election of only a part of the delegates to the convention. Under the specific language of the constitution, the General Assembly could take this right from the people only if it was "necessary for the preservation of the public peace, health and safety," and "such necessity" was "stated in" the act. Ark. Const. amend. 7. This provision means that it is "necessary for the General Assembly to state the fact that constitutes an emergency." *Burroughs* v. *Ingram*, 319 Ark. 530, 533, 893 S.W.2d 319, 320 (1995). The issue, then, is whether the General Assembly stated facts that constitute an emergency, requiring the acts to go into immediate effect.

The emergency clause of Act 1 states that the present constitution is archaic, that there is an immediate need to revise the complete document, and that piecemeal amendment is not sufficient. The emergency clause of Act 2 states that it is essential for the proper administration and provision of essential governmental programs that the expenses of the Arkansas Constitutional Convention for the 21st Century be met. Neither statement expresses an emergency. The word "emergency," in its most accepted usage, means some sudden or unexpected happening that creates a need for immediate action. *Burroughs* v. *Ingram*, 319 Ark. at 535, 893 S.W.2d at 320.

The current constitution was adopted in October 1874, and, without dispute, contains some archaic provisions. Over a number of years, there have been calls by members of this court for revision of some parts of the constitution. *Clark* v. *Union Pac. R.R.*, 294 Ark. 586, 593, 745 S.W.2d 600, 604 (1988) (Hickman, J., dissenting) (referring to Amend. 59 as the "Godzilla" of constitutional amendments); *Linder* v. *Howard*, 296 Ark. 414,

418, 757 S.W.2d 549, 557 (1988) (Newbern, J., concurring) (stating that to end "gamesmanship," we must amend our constitution and unify our court system). The obsolescence of parts of the constitution is not something new, nor is it something that has suddenly happened. Rather, its obsolescence in parts has been known for a number of years, so well known that a constitutional convention was held in accordance with Act 3 of the Extraordinary Session of 1977, as amended by Act 622 of 1979, and a new constitution was proposed. The proposed constitution was defeated at the general election held on November 4, 1980, by a vote of 464,210 to 276,257. *See* Ark. Const. pmbl. (Publisher's Notes). The fact that the current constitution is archaic in part and needs revision for our entry into the 21st Century is not a sudden occurrence or an unexpected event which has created a true emergency. No fair-minded person could differ in concluding that the General Assembly did not state an emergency that should cause acts appropriating $1,100,000 and providing for election of only some of the delegates to go into immediate effect, thus denying the people the right of referendum.

The chancellor studied Amendment 7 and our cases construing it, and understandably determined that the issue was whether the emergency clauses in Acts 1 and 2 stated an emergency. The chancellor held that the acts did not state an emergency. The plurality opinion reverses the chancellor's ruling, not by directly stating that the acts contain a recitation of facts that state an emergency, but rather by taking notice of litigation involving public school funding, medicaid funding, county sales taxes, equipment purchases by local governments, and challenges to initiated and referred measures. Contrary to our practice, the argument is allowed for the first time on appeal. From these judicially noticed facts, which were not mentioned in the emergency clauses, the plurality opinion finds "truth" in the statement that piecemeal amendment to the constitution is not suitable for these ills. However, the constitution explicitly states that the facts constituting an emergency must be *set out in the enactment.*

The plurality opinion disregards the express language of the constitution that provides that the fact constituting the emergency must be stated. The plurality opinion states that, under the authority of *Jumper v. McCollum,* 179 Ark. 837, 18 S.W.2d 359 (1929), it can search for "truth" of the stated fact by looking outside the

emergency clause. Neither the constitution nor the cited case so provide. The constitutional provision says the emergency "shall be stated" by the General Assembly in the enactment. These words should be given their accepted meaning. In addition, the cited case does not lend support to the plurality opinion; instead, it wholly supports this dissent. The material part of the cited opinion is quoted below so that the reader can decide for himself or herself which opinion is accurate:

In construing this constitutional amendment in the case of *Hanson* v. *Hodges,* 109 Ark. 479, 160 S.W. 392, it was held that all acts of the General Assembly are subject to the referendum except such laws as are necessary for the immediate preservation of the public peace, health and safety, but that it was a question exclusively for legislative determination whether a statute was necessary for the immediate preservation of the public peace, health or safety. It was also held in the case cited that, while the existence of an emergency must be declared by the Legislature so as to exclude the referendum, it was not essential that this declaration be made in the exact words of the amendment, as other words of similar import unmistakably showing the intention to declare that an emergency existed, were sufficient.

At the 1918 general election a new Initiative and Referendum Amendment was adopted. *Brickhouse* v. *Hill,* 167 Ark. 513, 268 S.W. 865. Section 4 of this amendment contains the following provisions in regard to emergency legislation:

"If it shall be necessary for the preservation of the public peace, health or safety, that a measure shall become effective without delay, such necessity shall be stated in one section, and if, upon a yea and nay vote, two-thirds of all the members elected to each house, or two-thirds of all the members elected to the city or town councils, shall vote upon separate roll-call in favor of the measure going into immediate operation, such emergency measure shall become effective without delay. It shall be necessary, however, to state the fact which constitutes such emergency. Provided, however, that an emergency shall not be declared on any franchise or special privilege or act creating any vested

right or interest or alienating any property of the State. If a referendum is filed against any emergency measure, such measure shall be a law until it is voted upon by the people, and if it is then rejected by a majority of the electors voting thereon, it shall be thereby repealed. The provision of this subsection shall apply to city or town councils."

It is not sufficient, under this last amendment, for the legislation merely to declare that an emergency exists, but it is necessary to state the fact which constitutes such emergency. If therefore an act is passed which does not contain an emergency clause in which the fact is stated constituting the emergency, the act does not become effective until ninety days after the adjournment of the session of the General Assembly at which it was enacted. *Gaster* v. *Dermott-Collins Road Imp. Dist.*, 156 Ark. 507, 248 S.W. 2. But does this last amendment change the rule announced in the Hanson case, *supra*, that the existence and sufficiency of the emergency to withdraw an act from the referendum clause of the Constitution is a legislative, and not a judicial, question? We think not.

It was, no doubt, the intention of the last amendment to terminate the practice, into which the General Assembly had fallen, of placing the emergency clause indiscriminately on much of the legislation, and, as a means to this end, two requirements were imposed to withdraw legislation from the operation of the referendum power of the people. One was that it was made necessary for the bill to state the fact which constituted the emergency. The other was to require a separate and two-thirds vote of all the members elected to each house of the General Assembly in favor of the measure becoming effective without delay. In this manner the members of the General Assembly were permitted and required to vote, first, whether the bill should become a law, and then to determine whether it should become effective without delay. Both these questions are, we think, legislative and not judicial.

It will not be denied that it is a legislative question solely to determine whether a bill shall become a law. If the Legislature has any function at all, it has this one; and, this being true, it must also be true that it is the province

and function of the Legislature to determine when the legislation shall become effective.

If there is an emergency, the General Assembly must state the fact which constitutes it, and must evidence the fact that they have found there was an emergency by a vote taken separate and apart from that taken on the passage of the bill itself. In this manner there is insured, theoretically, at least, the finding by two-thirds of the General Assembly that the fact recited exists and is true, and that it constitutes a sufficient reason for making the act effective without delay.

*Id.* at 838-40, 18 S.W.2d at 360-61.

It is now well established that the constitutional provision means that there must be some statement of fact *in the emergency clause* to show that a real emergency existed. *See, e.g., Burroughs* v. *Ingram*, 319 Ark. 530, 893 S.W.2d 319 (1995); *Mann* v. *Lowry*, 227 Ark. 1132, 303 S.W.2d 889 (1957); *Cunningham* v. *Walker*, 198 Ark. 928, 132 S.W.2d 24 (1939); *Gentry* v. *Harrison*, 194 Ark. 916, 110 S.W.2d 497 (1937); and *Jumper* v. *McCollum*, 179 Ark. 837, 18 S.W.2d 359 (1929). Precedents that cannot be distinguished should be followed unless injury and injustice result. *Independence Federal Bank* v. *Paine Webber*, 302 Ark. 324, 789 S.W.2d 725 (1990).

The plurality opinion ignores the test that is explicitly set out in the constitution. The result is that, under the rationale of the plurality opinion, the General Assembly in the future might state "this is an emergency," and the courts will then look for some basis to judicially notice "truth" in the statement.

The plurality opinion, in looking outside the acts for "truth," takes judicial notice of ten lawsuits involving public school funding, medicaid funding, county sales tax, equipment purchases by governments, and proposed constitutional amendments, and concludes that piecemeal amendment to the current constitution is not suitable. Aside from the disregard of the constitutional mandate, there are other errors inherent in the approach. Rule 201 of the Arkansas Rules of Evidence provides that judicial notice can be taken only of adjudicative facts: Judicial notice cannot be taken of legislative facts. Advisory Committee's Notes to the Federal Rules of Evidence. Under Rule 201 a high degree of

indisputability is the essential prerequisite for judicial notice. *See* Ark. R. Evid. 201(b). Therefore, the only facts that can be judicially noted from these cases are the facts that the cited cases were filed and resulted in the published rulings, opinions, or holdings. Many of the cases are old, one being decided as long ago as 1981. Not a single one of the decisions establishes the judicial fact that some unexpected, sudden, "emergency" event occurred in October 1995. They state no emergency. The people's right of referendum should not have been taken away.

Moreover, even if one accepts the plurality opinion's use of judicial notice, and even if one overlooks the plurality opinion's mistaken holding that the cited cases establish an emergency to avoid the piecemeal amendment of the constitution, one still must agree that an emergency was not stated in Act 2, because the piecemeal amendment recital simply is not contained in the emergency clause of Act 2. It is contained only in Act 1. Thus, even under the reasoning of the plurality opinion, the chancellor should be affirmed because Act 2 does not state an emergency.

In summary, the constitution provides that the General Assembly is authorized to make an act effective immediately "if it shall be necessary for the preservation of the public peace, health and safety" by enacting an emergency clause. "Such necessity *shall be stated in one section*" of the act. Ark. Const. amend. 7. This means that the General Assembly must "state the fact which constitutes such emergency." *Cunningham* v. *Walker*, 198 Ark. 928, 132 S.W.2d 24 (1939). Neither Act 1 nor Act 2 states an emergency involving public peace, health, or safety. It might have been possible to have described a deficiency in some particular of the constitution affecting public peace, health, or safety as to the emergency status of which persons might differ. Had such a fact been stated and had a mere constitutional amendment been proposed to correct such a deficiency, an emergency clause might have been appropriate. The truth is, however, that it is not possible to state an emergency requiring a rush to establish the machinery for rewriting a constitution. It should be obvious that when the creation of so fundamental a document as the premier organ of state government is at hand, the only acceptable approach must be deliberate, studied, and considered. The people should have an opportunity to take such an approach. Neither act should go into effect until ninety days after the end of the session.

## II.

The plurality opinion is made effective immediately, and understandably so because of the immediacy of the forthcoming election. As a result, the losing parties will not have a chance for rehearing and cannot further contest the outcome of this case. Because of these unusual circumstances, the following comment seems appropriate.

Six justices agree that chancery court has jurisdiction. Three, in the plurality opinion, vote to reverse the chancellor on the merits of the case and remand the case to chancery court, and three, in the dissenting opinion, vote to affirm the chancellor on the merits. The writer of the opinion labeled "concurring" does not accept the vote of the six justices that the chancery court had jurisdiction and understandably refuses to vote on the merits of the case. That justice votes to reverse and dismiss, rather than remand, on the ground that the chancery court had no jurisdiction. In sum, the vote on the merits is three to reverse and remand and three to affirm.

In cases involving the constitution "the concurrence of four judges shall be necessary to a decision." Ark. Code Ann. § 16-11-104 (1987). A judgment of the lower court will be affirmed where the majority of the judges agree to it even though they differ as to the reasons to affirm. *Pollock* v. *C. Hennicke Co.*, 64 Ark. 180, 46 S.W. 185 (1897). If there is a tie vote, three-to-three, and not four concurring votes to reverse, the lower court is affirmed. *Barnard & Leas Mfg. Co.* v. *Smith*, 77 Ark. 590, 92 S.W.2d 858 (1906).

This court requires "four votes, a majority of this court, to reverse a case." *Citizens Bank of Batesville* v. *Estate of Pettyjohn*, 282 Ark. 222, 667 S.W.2d 657 (1984).

The issue is whether the "concurring" opinion is, as a matter of law, a concurring opinion, and whether there are four concurring votes. However, it is an issue that will not be decided in this case because of the immediate mandate.

NEWBERN, J., joins in this dissent.

ROAF, J., joins in part I.