Mr. Dale Langston, Director Assessment Coordination Division Public Service Commission 1614 West Third Little Rock, Arkansas 72201
Dear Mr. Langston:
This opinion is being issued in response to your recent questions regarding various issues arising out of the implementation of Amendment59 of the Arkansas Constitution. You have asked:
 (1) What are the proper formulae to use to adjust millage rates on personal property and the property of public utilities and regulated carriers when the rollback provisions of Amendment 59 are invoked?
 (2) In a reappraisal which occurs over multiple years and in which the request for certification for the rollback does not occur until the second or later year of the assessment, what year is used as the base year for purposes of determining whether the rollback should occur or what revenue increases are allowed?
 (3) If the rollback provisions are invoked at the end of a multiple-year reappraisal, for which years do the rollback provisions apply (the last year only, or all previous years of the reappraisal?
 (4) If the rollback is applied retroactively, would the taxing unit be responsible for refunds?
RESPONSE
General
Before proceeding to respond to your specific questions, I must note that issues relating to Amendment 59 are always complex. Many of these issues have not, as of yet, been addressed judicially or clarified legislatively. As Justice Hickman stated in Clark V. Union Pac. R.R.,294 Ark. 586, 745 S.W.2d 600 (1988): "Amendment 59 is the `Godzilla' of constitutional amendments. Nobody knows what it means." Id. at 593, Hickman, J., dissenting. In light of the complexity of Amendment 59 and the lack of available legislative or judicial guidelines for interpreting it, my office is not in a position to draw any definitive conclusions as to its appropriate interpretation or application. We are constrained to read Amendment 59 and its implementing legislation (A.C.A. § 26-26-401 etseq.) under the guidance of the Arkansas Supreme Court's most basic rules of statutory and constitutional interpretation. This process entails attempting to ascertain the drafters' intent from the language that they employed. See Thomas v. Cornell, 316 Ark. 366, 872 S.W.2d 379 (1994).
Question 1 — What are the proper formulae to use to adjust millage rateson personal property and the property of public utilities and regulatedcarriers when the rollback provisions of Amendment 59 are invoked?
It is my opinion, as explained more fully below, that the formulae that should be used to adjust millage rates on personal property and the property of public utilities and regulated carriers when the rollback provisions of Amendment 59 are invoked are those that are set forth in A.C.A. § 26-26-402(a)(3) and A.C.A. § 26-26-405 (for personal property), and in A.C.A. § 26-26-402(a)(4) and A.C.A. § 26-26-406 (for property of public utilities and regulated carriers).
You indicate that your particular concern with the use of these formulae is that they will result in a de-equalization of the millage rates for real and personal property. As you explain in your correspondence, the use of these formulae in the time period since the statewide reappraisals that took place in response to Arkansas Public Service Commission v.Pulaski County Board of Equalization, 266 Ark. 64, 582 S.W.2d 942 (1979) has resulted in an almost complete equalization of real and personal property millage rates. However, you point out that if the rollback provisions are invoked after the most recent round of real property reappraisals, the effect will be a de-equalization, since, under the above-referenced formulae, real and personal property millage rates are not rolled back equally. That is, if millage rates that are equal (or nearly equal) are rolled back unequally (as they must be under these formulae), the current state of equalization will be skewed.
It is true that a certain degree of de-equalization will result from the use of these formulae after equalization has been achieved, and that such a result would appear to undermine the very purpose of Amendment 59. Amendment 59 was enacted in response to the Arkansas Supreme Court's decision in Arkansas Public Service Commission v. Pulaski County Board ofEqualization, 266 Ark. 64, 582 S.W.2d 942 (1979). In that case, the court held that Article 16, § 5 of the Arkansas Constitution requires that real and personal property be taxed on an equal basis. Amendment 59 created a mechanism whereby an equalization of real and personal property millage rates could be achieved, while at the same time assuring that the taxpayers would bear no more than a 10% tax increase at one time.
The drafters of Amendment 59 did not include a mechanism whereby the amendment would cease to be effective after its purpose was accomplished, nor did they provide for the use of a different set of formulae if rollback is necessary after equalization is achieved. I must therefore conclude that the drafters recognized and contemplated that de-equalization would occur after any reappraisal that results in an increase in property values of 10% or greater.
It should be noted that if Amendment 59 had contained only a requirement and goal of equalization, then equalization could, in fact, be a one-time, permanent achievement. Rollbacks would not be necessary, and equalization, once achieved, would not be disturbed. However, Amendment 59 was designed not only to achieve equalization, but also to hold tax increases to a 10% level. It was for this reason that the rollback provisions were included. The fact that Amendment 59 and its implementing legislation contain this tax increase ceiling requirement (which is accomplished via the rollback formulae), but do not contain a different formula to temper the de-equalizing effect of the tax increase ceiling after equalization has been achieved, indicates that the drafters of the amendment and the legislation were aware that equalization would periodically be thrown out of kilter and would therefore have to be re-achieved periodically. The fact that the drafters provided for the use of only one set of formulae indicates that they contemplated the need for re-equalization after certain reappraisals. The formulae that the drafters provided are the means by which they apparently intended that such re-equalization should be accomplished. Because Amendment 59 continues to be a viable part of our constitution, it must be complied with; because Amendment 59 provides for only one set of formulae, those are the formulae must be utilized in complying with the amendment.
The drafters' contemplation and anticipation of this periodic de-equalization effect and the resulting need to re-equalize is also evident from the language of both the amendment and the implementing legislation, which require a rollback (uniformly entailing the application of the formulae about which you have inquired) "[w]henever a countywide reappraisal or reassessment of property subject to ad valorem taxes . . . shall result in an increase in the aggregate value of taxable real and personal property in any taxing unit in this state of ten percent (10%) or more over the previous year. . . ." Ark. Const., art. 16, § 14(a) (emphasis added); A.C.A. § 26-26-402(a)(1) (emphasis added). The Merriam-Webster dictionary defines the term "whenever" to mean "at whatever time." The term "whatever," in turn, is defined to mean "no matter what" These definitions indicate that the term "whenever," as used in the amendment and the legislation, requires the application of the rollback formulae any number of times — not just the times up until equalization is achieved for the first time.
If the drafters had intended that equalization not be disturbed after reappraisal, they could have provided a separate formula to achieve that end. Similarly, if they had intended that Amendment 59 no longer be effective after the achievement of equalization, they could have so provided. The fact that they did not do these things indicates that they opted instead for the approach of re-achieving equalization after reappraisal.
The drafters provided only one set of formulae by which equalization can be achieved and re-achieved, and as long as Amendment 59 in its current form remains a part of our constitution, these formulae must be complied with. I note again, however, that the conclusion I have reached (despite its necessity) does appear to conflict with the purpose underlying Amendment 59, and that the issues and problems that you have raised can be addressed and clarified either legislatively or judicially. This, ultimately, is the only means by which a definitive solution regarding these matters can be formulated.
Question 2 — In a reappraisal which occurs over multiple years and inwhich the request for certification for the rollback does not occur untilthe second or later year of the assessment, what year is used as the baseyear for purposes of determining whether the rollback should occur orwhat revenue increases are allowed?
It is my opinion that the "base year" for purposes of determining whether the rollback should occur or what revenue increases are allowed, is the year prior to the first year of the multiple-year reappraisal in question. This is the only approach that will reflect, for all areas of the county, the actual increase in appraised property values. Any other approach would render the rollback provisions meaningless, because it would allow the comparison of two years in which property values in certain areas of the county are the same, and would, at the same time, fail to compare the two years in which property values in those areas increased as a result of the reappraisal. Such an approach clearly would subvert the intent of the rollback provisions and would defeat their purpose.
The most basic rule of statutory interpretation is to give effect to the intent of the legislature. Ark. Dept. of Health v. Westark ChristianAction Council, 322 Ark. 440, 910 S.W.2d 199 (1995). The Arkansas courts have held that in interpreting statutory language, it is inappropriate to give the statute a reading that would result in an absurdity, or to presume that the legislature enacted a vain and meaningless law. See Neelyv. State, 317 Ark. 312, 877 S.W.2d 589 (1994); Death and Total PermanentDisability Trust Fund v. Whirlpool Corp., 39 Ark. App. 62, 837 S.W.2d 293
(1992). The rules of statutory interpretation apply equally to the interpretation of constitutional language. Gazaway v. Greene CountyEqualization Bd., 314 Ark. 569, 864 S.W.2d 233 (1993).
It should be noted that I have recently opined that when a reappraisal is conducted under one of the circumstances that can trigger the provisions of Amendment 59, see A.C.A. § 26-26-401, the application of the rollback is mandatory in the year in which taxes calculated upon the basis of the reappraisal are imposed for the first time. See Op. Att'y Gen. No.96-297, a copy of which is enclosed. As I stated in that opinion, if taxes based upon the reappraisal are imposed in the reappraised areas prior to the end of a multiple year reappraisal,[1] the rollback must be applied at the time that the new tax is imposed (assuming that the reappraisal is one that legitimately triggers Amendment 59 under A.C.A. § 26-26-401). Implicit in that opinion (although I was not directly presented with the question) was the view that the calculation of the tax increase for purposes of determining whether to apply the rollback should be made by comparing reappraised values with the appraised values prior to the reappraisal. This approach necessarily entails comparing reappraised values with the values that were reflected on the record in the year prior to the first year of the multiple-year reappraisal.[2] I rejected the approach of comparing the year in which the final portion of the reappraisal is completed with the year immediately preceding completion of the entire reappraisal, for all areas of the county. See
Op. Att'y Gen. No. 96-297, Page 5. Such an approach would allow the comparison of two years in which property values are the same for the areas that had been reappraised in the first year of the multiple-year reappraisal. This would be an absurd result that clearly was not intended by the drafters of Amendment 59.
Therefore, in accordance with Op. No. 96-297, I conclude that the "base year," for purposes of determining whether the rollback should occur or what revenue increases are allowed, is the year prior to the first year of the multiple-year reappraisal.
Question 3 — If the rollback provisions are invoked at the end of amultiple-year reappraisal, for which years do the rollback provisionsapply — the last year only, or all previous years of the reappraisal?
In accordance with the response to Question 2 and with Attorney General Opinion No. 96-297, it is my opinion that if the rollback provisions are invoked at the end of a multiple-year reappraisal, they must be applied to every year for which taxes calculated on the basis of the reappraised values were imposed.
Question (4) — If the rollback is applied retroactively, would the taxingunit be responsible for refunds?
Assuming that it is conceded that the rollback could have been appropriately applied in a previous year, and is therefore applied retroactively, the issue of tax refunds (if refunds are in order) will be governed by the provisions of A.C.A. § 26-35-901. The common law "voluntariness doctrine" may also be applicable. This office analyzed A.C.A. § 26-35-901 in Opinion No. 88-294 (a copy of which is enclosed), and concluded that where a claim for the refund of erroneously assessed and collected taxes has been validly, factually established, the statute requires that the refund be made from the entity which holds the revenues. In that opinion, this office pointed out that a primary consideration in relation to any question of tax refunds is the "voluntariness doctrine," which, under certain circumstances, precludes the refund of taxes that were voluntarily paid. For further discussion of the "voluntariness doctrine," see Op. Att'y Gen. No. 89-164, a copy of which is enclosed. The voluntariness doctrine may preclude refunds in the situation about which you have inquired.
The question of tax refunds is always very fact-intensive and will turn largely upon the evidence that is adduced in support of the claim for refunds, as well as the evidence presented in support of the applicability of the "voluntariness doctrine." Similarly, the question of responsibility for payment of refunds is also quite fact-oriented, and must involve a consideration of the particular manner of and parties involved in collection and disbursement. For these reasons, I cannot opine conclusively in response to your question. I merely point you to the governing statute, to the previous opinions of this office, and to the cases cited therein regarding refunds and the voluntariness doctrine. These sources of law and information may be used as guidelines in determining the appropriate course of action.
Finally, with regard to all of your questions, I reiterate that issues surrounding Amendment 59 are particularly thorny, and are likely to remain so until such time as further judicial or legislative clarification has been provided.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General Suzanne Antley.
Sincerely,
WINSTON BRYANT Attorney General
WB:SBA/cyh
[1] As I also noted in Op. No. 96-297, I have recently addressed the question of whether it is permissible to impose taxes in the reappraised area that are calculated on the basis of the reappraisal, even though the entire countywide reappraisal has not been completed. In Opinion No.96-289, a copy of which is enclosed, I concluded that the law is not clear as to whether taxation in this manner is permissible or not. I opined that because the law does not definitively address this question, it will have to be clarified either legislatively or judicially. I did note, however, that from all available indications, the issue of fairness will undoubtedly be central to any such process of clarification. As I did in Op. No. 96-297, I will assume, for purposes of addressing your question, that taxation in this manner is permissible.
[2] Of course, for areas of the county reappraised later in the multiple-year reappraisal, the same result can be achieved simply by comparing their reappraised property values with the property values reflected on the record in the year previous to that in which their area of the county was reappraised. Indeed, this could be one way of stating the base year for each area of the county: The base year for each area of the county is the year previous to the year in which property values in that area are recalculated pursuant to the reappraisal. However, this approach would require the use of different base years for each area of the county, which could present administrative difficulties. The same result can be achieved using only one base year for the entire county, if the base year is the year prior to the first year of the multiple-year reappraisal.